**STATE of Missouri, Respondent,**

v.

**Gerald HOLLIS, Appellant.**

**No. KCD 29582.**

Missouri Court of Appeals,
Western District.

June 29, 1979.

Philip H. Schwarz, McMullin, Wilson & Schwarz, Kansas City, for appellant.

John D. Ashcroft, Atty. Gen., J. Michael Davis, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., SWOFFORD, C. J., and WASSERSTROM, J.

SWOFFORD, Chief Judge.

The appellant (defendant) was convicted of murder in the second degree by jury verdict and he was sentenced to 99 years and 1 day in the Missouri Department of Corrections and this appeal followed in due course.

The facts appearing from the record pertinent to the issues on this appeal may be thus summarized:

In the early morning hours of July 26, 1975, Mrs. Lelia M. Neely returned to her home at 7453 Walrond in Kansas City, Missouri and found her husband, Ernest K. Neely, on the bed in their bedroom covered with blood and· apparently lifeless. She fled from the home and the police were called. Upon arrival, the police found Mr. Neely lying face-up on the bed with his head and chest covered with blood. He was cold and there was no discernible pulse. Later medical examination disclosed that he had suffered lacerations of the face and head, multiple skull fractures and severe injury to the brain.

Investigation of the Neely home disclosed that the window screen ordinarily screening a window to the den was removed and leaning against the outside wall of the house and it had been slit at a point next to the window lock. The window was open, the window curtains disturbed and a cover over a sofa in the den beneath the window was mussed. The telephone had been torn loose. A portable TV and two stereo speakers were missing from the home, and the family dog had a noticeable swollen place on its head.

The State offered the testimony of Adrian Kemp, who was acquainted with the defendant and who resided at 7429 College, in the same neighborhood as defendant. On the morning of July 26, 1975, he was working on his car at his home when he observed the defendant approaching west on 75th Street from the direction of a vacant house. The defendant told Kemp he had killed a man and that he had a TV and two speakers at the vacant house. The defendant told Kemp he had hit "the man" with a hammer in a house at the corner of 75th and Walrond; that he had gone into the house through a window; that he had also "knocked the hell out of the dog, some dog"; that the man was on a bed and started to raise up and "he started beating the man with the hammer"; that he then got the color TV and stereo speakers and

put them at the side of a vacant yellow house next-door to the house "he was in"; that he then went back in the house to "finish" and beat the man some more; and, that he then went to his home at 7412 College and washed the blood from his arms and the hammer.

The defendant then asked Kemp if he would drive him to 64th and Benton. Kemp agreed to do so and the defendant got the speakers and TV and put them in the trunk of Kemp's car. They then drove to 6411 S. Benton and took "the stuff" into that house and left the items there. The next afternoon Kemp drove the defendant to 6411 S. Benton and then to a barber shop in the vicinity of 32nd and Prospect; the defendant took a portable TV into the shop, returned with $50.00 and gave Kemp $5.00. A few days later, Kemp gave a full statement to the police.

Melody Channel testified for the State that on July 26, 1975, in the early forenoon, the defendant came to her home at 6411 S. Benton. She stated that she did not see the stereo speakers at that time, but did see them on July 30, 1975 when the police came to her home. Upon the latter occasion the police picked up two stereo speakers and the record discloses that Mrs. Neely identified one of these as belonging to her husband and as missing from their home.

On July 30, 1975, Police Officer William Martin interviewed the defendant at the Juvenile Justice Center of Jackson County, Missouri. Martin testified that the defendant, his father, Juvenile Officer Steivers, and Police Officer Noel were present. Martin, Steivers and Noel advised both the defendant and his father of the defendant's rights under *Miranda*, and a *Miranda* waiver was signed. At this interview the defendant denied any connection with the burglary at Neely's home. He stated that he had stayed at home until 12:30 or 1:00 a. m. on July 26, 1975; had then gone walking, stopping at Adrian Kemp's house and helping Kemp work on a car; he and Kemp had then gone riding; and they had stopped at "Brian's" house on South Benton for a few minutes. The defendant specifically

denied that he had taken anything into the Channel home at 6411 South Benton.

When advised by Officer Martin that the police had recovered two stereo speakers at the Channel house that day, the defendant told the police he had lied. He then stated that he had left his home at about 1:00 a. m. on July 26, 1975 and had run into "four dudes" (not otherwise identified) at a park at 74th and Bellefontaine, had engaged in a crap game with them and had won $35.00. The defendant stated he then left the "dudes" and walked to 75th and Indiana where he again ran into the same "dudes", who at that time had in their possession two stereo speakers and a portable TV which the defendant purchased from them with the $35.00 he had previously won from them at craps. He stated he concealed these items in the bushes at 75th and Indiana when the "dudes" refused to take him to the Channel house on South Benton. He stated he then contacted Adrian Kemp, who drove him to the Channel house where they dropped "the stuff". After relating these occurrences and at the suggestion of Officer Martin, the defendant and his father retired to another room for a private conference. Upon their return they stated that they were "going to stay with the story", would have to get a lawyer, and did not want to talk to the officials any further. The interview was thereupon terminated.

█ The defendant did not testify and offered no evidence in his defense. He was sixteen years of age at the time of the offense and his arrest. He raises as Point II on this appeal that the trial court lacked jurisdiction over the cause for the reason that there was no record before the court that the juvenile court had ever relinquished its exclusive jurisdiction, granted by Section 211.031 RSMo 1976 Supp., over the defendant as required by Section 211.-071 RSMo 1969. See *State v. Ford*, 487 S.W.2d 1[3, 6] (Mo.1972).

The defendant filed no motion in the general criminal division below requesting dismissal of the proceedings or remand to the juvenile court as contemplated by Rule 25.06, Rules of Criminal Procedure. The only reference to this lack in the transcript was a comment by the trial court that the file before it did not contain the juvenile record affecting jurisdiction and his inquiry of counsel if the defendant was "certified here from the Juvenile Court?" In response to this, the following appears:

"MR. PIERCE (Defense counsel): My understanding is that he was.

MR. DAKOPOLOS (Prosecutor): Yes, Your Honor."

The trial then proceeded without further mention of the matter.

The State argues with convincing force that the defendant has waived his objections as contained in Point II under the state of the record and under the authority of *Jefferson v. State*, 442 S.W.2d 6, 12[7] (Mo.1969); *Ford v. State*, 534 S.W.2d 111 (Mo.App.1976), and *State v. LePage*, 536 S.W.2d 834, 836[2] (Mo.App.1976). The defendant, however, counters by requesting that if this point is "capable of being waived" that it be considered under Rule 27.20(c) as plain error. The defendant cites in support of this argument the case of *State ex rel. D____ V____ v. Cook*, 495 S.W.2d 127, 128[1] (Mo.App.1973), where this Court properly held that the statutory provisions dealing with the handling of juveniles in the preliminary stages constituted a critically important stage of the ensuing criminal prosecution and must conform to basic requirements of due process and fairness.

Further discussion of these positions and authorities is unnecessary for the decision here because following the submission of the cause the State (respondent) moved that the documents reflecting the proceedings in the Juvenile Court be forwarded to this Court as part of the record on appeal, and that motion was sustained by this Court under Rule 81.12(c) which authorizes this Court to do so when " * * * anything material to either party has been omitted from the transcript by error or accident * * *", and Rule 84.03 which empowers this Court to order the Circuit Clerk to send directly any part of the pertinent records.

In accordance with this Court's order, the Attorney General has filed here duly certified copies of the formal records of the Juvenile Court with reference to the proceedings there following the defendant's arrest, including the "Order Dismissing Petition and Allowing Prosecution Under General Law" relating to this defendant, and such documents are found to be in full and meticulous compliance with all statutory requirements permitting the indictment and prosecution of this defendant in the court below.

The trial court had jurisdiction over the cause and defendant's Point II is ruled against him.

The defendant charges that the trial court erred in failing to sustain his motion to discharge for the reason that he was not provided a speedy trial as guaranteed by the Sixth Amendment to the Constitution of the United States since more than seven (7) terms of court had passed between the time of his indictment and the time of his trial (Point I).

■■■ To implement the constitutional right to a speedy trial the General Assembly of Missouri had enacted certain statutes. Generally, these statutes provide that a person charged with a crime who shall not be brought to trial before the court having jurisdiction before the end of the second term of such court "after such indictment found" shall be entitled to be discharged unless such delay shall happen on the application of the prisoner or by reason of lack of time to try the cause at the second term. Section 545.890 RSMo 1969. The time or number of terms thus specified is, however, extended to three terms in counties in which there shall be more than two regular terms of court, excluding the term in which the indictment was found. Section 545.920 RSMo 1969. This latter section applies to the case at bar since Jackson County by statute has five regular terms of court. Section 478.247 RSMo 1969. (Repealed as of January 2, 1979)

Therefore, the defendant's position is that since more than three terms of court elapsed after the term in which he was indicted, he was entitled to be discharged after the end of the fourth term. Section 545.890 RSMo 1969. Indeed, the record stands clear that the defendant was indicted during the May term of 1975 and was brought to trial on March 7, 1977 near the end of the January term 1977. Disregarding the term in which the indictment was found, as is required by the above-cited statutes and decisional law, *Hulstine v. State*, 533 S.W.2d 228, 230[8] (Mo.App.1975), the defendant was confined before trial for nearly eight (8) full terms of court over a period of about 20 months.

■ However, this constitutional guarantee to a speedy trial is not violated by the mere passage of time, in this case 20 months and 7 terms of court. Such fact does not establish, *per se* and standing alone, a constitutional violation. *State v. West*, 484 S.W.2d 191, 193[3] (Mo.1972). See also: *U. S. v. Weber*, 479 F.2d 331, 332[2] (8th Cir. 1973), 21 months; *U. S. v. Baumgarten*, 517 F.2d 1020, 1026[5] (8th Cir. 1975), 21 months; *U. S. v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), 19 months.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) the Supreme Court set down four factors which will be considered on this issue: 1) reason for the delay; 2) defendant's assertion of his constitutional right; 3) prejudice to the defendant; and 4) length of the delay.

■ It is the basic and underlying purpose of both the Sixth Amendment guarantee and the Missouri Statutes to ensure a speedy trial and to prevent laches on the part of the State or other prosecuting authority, but is not intended to operate if the trial is delayed through no fault of the State, *State v. Mace*, 427 S.W.2d 507, 509[2] (Mo.1968), as where the defendant's requests for continuances (or consents thereto) or other actions by defendant cause the delay, *State v. Barlish*, 421 S.W.2d 558, 559[1] (Mo.App.1967); *State v. Barrett*, 406 S.W.2d 602, 604[5] (Mo.1966). In this case, the record discloses that an application for a continuance was filed by defendant which

apparently resulted in postponement of the trial through June 14, 1976. Also, he filed a Motion for Mental Examination on September 12, 1975 (which was granted) and on October 13, 1976 (which was denied). Further, he was apparently represented throughout the course of these proceedings by three different lawyers. These matters are mentioned not in criticism of the defendant or his counsel but to demonstrate that some delay was directly caused by the defense. On the other hand, the record discloses that no request or action by the State resulted in any delay.

 Furthermore, the defendant herein did not at any time request or assert his constitutional right to a speedy trial, a prerequisite condition to discharge. As was said in *State v. West*, 484 S.W.2d 191, 193–194[3] (Mo.1972):

"These sections (of Missouri statutes) have recently been interpreted not to entitle an accused awaiting trial to be released simply because the required number of terms have elapsed *but to require in addition to that a showing that he has demanded a trial and that his request was made unsuccessfully for a reasonable length of time before his right to release has been asserted. State v. Harper, Mo. Sup. en Banc, 473 S.W.2d 419.*" (Emphasis supplied)

See also: *State v. Haslip*, 583 S.W.2d 225 (Court of Appeals, Southern District, 1979; *Hulstine v. State*, supra, l. c. 230[5].

Having failed to make such request or assert such right, the defendant did on March 2, 1977 file his motion to dismiss for lack of a speedy trial, which was denied on the morning the trial commenced, March 7, 1977, which denial is now urged as error. If by indulging a broad degree of tolerance this motion could be deemed a request for a trial, he obtained the trial four days thereafter.

█ Finally, there was no attempt by the defendant to show that he was prejudiced by the delay or that such "involved purposeful or deliberately oppressive actions by the state prosecuting officials". The record affords no basis for a claim that he was denied the federal and state constitutional guarantees. *State v. Rowlett*, 504 S.W.2d 48, 55[4] (Mo.1973).

The defendant's Point I is ruled against him.

The defendant's Point III is that the court erred in failing to suppress evidence of statements made by him to police officers for the reason that there was no showing on the record that he was advised that criminal responsibility could result from the statement and that the police officers were his adversaries rather than his friends. From the wording of this allegation of error it is not clear as to the exact occasion referred to when the defendant's due process rights, as a juvenile, were thus alleged to have been violated. A reading of his motion for a new trial (paragraph 9) and the argument portion of his brief make it apparent that the time referred to was the interrogation of defendant at the Juvenile Justice Center on July 30, 1975, testified to by Officer Martin, as hereinabove summarized.[1]

 The defendant did not file a motion to suppress the testimony of Officer Martin nor ask for a hearing as to the admissibility thereof under the formula of *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 1780[5–7], 12 L.Ed.2d 908 (1964). It is only by means of such independent evidentiary hearing, out of the presence of the jury, that the court can make a proper finding as to the voluntary issues of the statement (as was done in this case pertaining to the testimony of jailor O'Connor). This hearing and the procedures mandated

---

1. Prior to the reception of evidence a hearing was had before the court on defendant's motion to suppress the testimony of O'Connor, a jailor at the Jackson County jail as to conversations with defendant wherein he *confessed* the murder. The motion to suppress was *sustained*. During the direct examination of Officer Martin he began to testify that he had talked to the defendant at his home before the interview at the Juvenile Justice Center on July 30, 1975, and upon objection by counsel that line of questioning was dropped and did not go beyond the bare fact that Officer Martin had seen the defendant at his home.

by *Jackson v. Denno*, supra, apply where the admission or confession is properly challenged and a hearing requested, *State v. Jackson*, 448 S.W.2d 895, 896[1] (Mo.1970), and no duty or obligation rests upon the trial court to conduct, sua sponte, such an evidentiary hearing, *State v. Kelly*, 539 S.W.2d 106, 111[10] (Mo. banc 1976); *State v. Blanchard*, 527 S.W.2d 37, 38[1] (Mo.App. 1975). Neither did the defendant object to any question or move to strike any answer or to discharge the jury during the testimony of Officer Martin relating to the interview at the Juvenile Justice Center. Therefore, under the clear decisional mandate of the Missouri courts, this point was not properly preserved for review. *State v. Cluck*, 451 S.W.2d 103, 105[4] (Mo.1970); *State v. Caffey*, 457 S.W.2d 657, 659[3] (Mo.1970); *State v. Shelton*, 544 S.W.2d 599, 600[1] (Mo.App.1976).

■ Defendant's Point V is posed against the same factual background as Point III, namely, events occurring during the interview at the Juvenile Justice Center on July 30, 1975. He charges that the trial court erred in permitting Officer Martin's testimony "to the effect that appellant refused to talk to the police officers" which violated his constitutional right against self-incrimination. He has reference to the fact stated by Officer Martin that, after defendant had related his involvement in the crap game in the park, his winning and subsequent purchase from the same "dudes" of the "stuff" with those winnings, that he and his father did not want to talk to Martin further. Here again, no objection was made to this testimony nor was its admission asserted as a ground in the defendant's motion for a new trial. Accordingly, it was not properly preserved for review.

Regardless of the record before this Court on this appeal, because of the serious nature of the offense charged and the resulting sentence, this record and the authorities relied upon by the defendant and those resulting from independent research have been carefully reviewed and studied in accordance with Rule 27.20(c) in search of "plain error". None appears or develops from such efforts.

The interrogation at the Juvenile Justice Center was conducted with scrupulous care; the defendant's interests were represented by Juvenile Officer Steivers, who along with the police officers gave him the *Miranda* warnings; he was specifically asked, and denied, that he had anything to do with the Neely burglary after being told that Officer Martin had recovered the speakers from 6411 S. Benton; he was freely permitted to tell his versions of the events and his activities during the night and early morning hours of the dates in question; he was provided means for private conference with his father, and further, on cross-examination by his counsel it was brought out by means of a leading question that "he didn't kill anybody".

■ There was not a shred of evidence or facts from which any reasonable inference could possibly be drawn that this occasion was beclouded by any coercion, duress, or promises of leniency or reward or otherwise corrupted. In the absence of such evidence his statements to Officer Martin must be deemed voluntary within the meaning of that word as applied to the protection of his constitutional rights. *State v. Montgomery*, 424 S.W.2d 744, 745[2] (Mo.1968); *State v. Hester*, 425 S.W.2d 110, 114[4] (Mo.1968).

■ The only basis for the position taken by the defendant that he was not properly advised of his rights at the July 30, 1975 interview is that he was not told that criminal responsibility could result from any statements he might make and that the officers present were his adversaries and not his friends. It is inconceivable that when he was asked about the burglary of the Neely home and the items taken and (as brought out by defense counsel in cross-examination) about "killing", that the defendant and his father could entertain any doubts about the officers' purpose to find out about his possible involvement in serious crimes. That they were aware of this and that Martin was to that extent at least an "adversary" is evident from the fact

that, after the defendant gave his first version of his activities on the dates in question, the defendant admitted the untruth of that account and came forth with a more elaborate conflicting version, followed by the decision to terminate the interview and obtain a lawyer.

■ All the prosecutor did was to show by Officer Martin how and why the interview was terminated by this decision of the defendant and his father after the defendant made voluntary conflicting statements. Such showing was permissible. *State v. Starks*, 459 S.W.2d 249, 252[8] (Mo.1970).

This record does not form any basis for a finding by this Court that the matters complained of in Points III and V resulted in "manifest injustice or miscarriage of justice" as required by Rule 27.20(c). *State v. Brown*, 543 S.W.2d 796, 797[2] (Mo.App. 1976). Defendant's Points III and V are ruled against him.

■ In Point IV of defendant's brief, he bases his claim of error upon the charge that the trial prosecutor was prejudiced against him and that the trial should not have been held when and where it was. In support of this point the defendant sets forth a number of pretrial and trial incidents which are claimed to demonstrate the alleged prejudice of the prosecutor, which he asserts, retrospectively, give rise to the basic error that the trial should not have proceeded. None of the complaints were preserved for review.

The defendant made no objection to the time and place of trial nor to any of the cited examples of prosecutorial prejudice or misconduct. Neither did he request that the alleged prejudiced prosecutor be removed or the trial suspended or continued, or for any other relief. Neither were any of his present complaints incorporated in his motion for a new trial, a condition mandatory for preservation for review. *State v. Madison*, 537 S.W.2d 563, 565[5] (Mo.App. 1976); Rule 27.20(a).

■ This Court has nevertheless undertaken a careful examination of the record as it pertains to the conduct of the trial prosecutor in the light of the charges of prejudice leveled against him and find such charges to be completely without merit or substance. On the contrary, it convincingly appears that the prosecution was conducted with skill and with meticulous care to conform to the highest standards and obligations of prosecutorial conduct. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935); *State v. Taylor*, 508 S.W.2d 506 (Mo.App.1974); *State v. McElroy*, 518 S.W.2d 459 (Mo.App. 1975).

This record does not warrant, in the slightest degree, a conclusion that the prosecutor's conduct or attitude nor the trial court's proceeding with the trial resulted in manifest injustice or miscarriage of justice. *State v. Brown*, 543 S.W.2d 796, 797[2] (Mo. App.1976); Rule 27.20(c). Point IV is ruled against the defendant.

The last charge of error, Point VI, is based upon the submission of the case to the jury on murder, second degree. The defendant argues that since the indictment charges conventional first degree murder and the evidence supported a submission of felony murder, the defendant was convicted of a crime for which he was not charged and of which there was no substantial evidence.

The trial court did submit the case on murder, second degree and manslaughter. No instruction on felony murder was tendered or given. The jury returned its verdict of guilty on murder, second degree and assessed the penalty at 99 years and 1 day.

■ Here, once again, the alleged error is not preserved for review. No objection was made to the instructions either when tendered or in the defendant's motion for a new trial. *State v. Cluck*, supra; *State v. Shelton*, supra.

■ However, even if this point was properly preserved, it is without merit. It is clear from this record that the court *could* have submitted this case on felony murder, second degree, since the evidence supported a finding that Neely's death occurred during the course of a burglary of

his house and that the defendant caused his death and did not do so in sudden anger provoked by any unexpected acts of the victim. Alternate theories supporting a conviction may be submitted if each theory is supported by the evidence. *State v. Green*, 511 S.W.2d 867, 874[13] (Mo.1974); *State v. Mullen*, 532 S.W.2d 794, 797[4] (Mo. App.1975). The trial court could have submitted this case on both felony murder and murder, second degree. Defendant was not prejudiced by reason of the manner in which this case was submitted. *State v. Chambers*, 524 S.W.2d 826, 829 (Mo. banc 1975).

The defendant's argument on this point boils down to the rather startling weird result that he had a "right" to be convicted of the greater offense of felony murder or be acquitted. Section 556.220 RSMo 1969 provides, *inter alia* :

"* * * any person found guilty of murder in the second degree, * * * shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide." (Repealed as of 1–2–79)

See also: *State v. Nibarger*, 391 S.W.2d 846, 848[1] (Mo.1965).

 Since the evidence in this case supports both theories of felony murder and murder, second degree, it was not error for the court to submit upon the latter theory. Point VI is ruled against the defendant.

The judgment is accordingly affirmed.

All concur.