STATE of Missouri, Respondent,

v.

Gurney Edward BUCKLES, Appellant.

No. 63808.

Supreme Court of Missouri,
En Banc.

Aug. 23, 1982.

**916**

Amy Johnson Davis, Bloomington, Ill., for appellant.

Hon. John Ashcroft, Atty. Gen., Neil MacFarlane, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM:

Gurney Edward Buckles was convicted of second degree murder and sentenced to forty years in prison for the killing of Donald Stewart. An expanded panel of the Court of Appeals, Western District, affirmed the judgment; the case was certified to this Court by a dissenting judge in belief that the majority's decision on one of several points on appeal was in conflict with *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981). The case is determined as an original appeal, Mo.Const. art. V, § 10; the judgment will be affirmed in an opinion which incorporates much of the majority opinion of Swofford, Senior Judge.

The statement of facts in appellant's brief is accepted by the state and upon comparison with the transcript and record is deemed to be in full compliance with the rule governing such statement.

On January 13, 1978, Gurney Edward Buckles was hitchhiking north on Interstate Highway 29 in north Missouri when he was picked up by Donald Stewart, the eventual victim of this homicide. Stewart told Buckles he was on his way to Sanborn, Minnesota, to purchase a newspaper operation, and asked Buckles to accompany him in case of automobile trouble. Buckles agreed, and over the course of the next two days, he and Stewart traveled to Sanborn and then returned to Buckles's "home territory" around Forest City, Missouri, on January 15, 1978. During the course of this journey involving two overnight motel stays, Stewart asked Buckles to participate in homosexual acts, which Buckles refused on two separate occasions. ·

Upon arriving at the trailer of Buckles's friend, Jim Book, located eight miles south of Forest City, Missouri, Buckles opened his door, reached around to the back seat to retrieve his backpack, and turned around to find Stewart with a knife in his hand; Stewart insisted Buckles perform sodomy. After orally refusing but still encountering Stewart's insistence, Buckles swung his backpack around striking Stewart's arm. In the ensuing struggle, Buckles obtained the knife and stabbed Stewart a couple of times in the front, then jumped out of the car, pulled Stewart out, and stabbed him some more. Buckles testified he was scared, mad, and a little shocked at the time.

Following this stabbing, Buckles placed Stewart's body in the rear seat of the car, drove down to the bank of the Missouri

River, which in January contained ice chunks, and put the body in the water. Buckles removed Stewart's identification and took $10.00 from his coat. He had considered rolling the entire car into the river, but decided to utilize it to rob "something" to enable him to leave that part of the country. He didn't call the authorities because he had long hair and a beard, the victim was a teacher, and therefore he felt he would not be believed. He drove the car to Oregon, Missouri and parked it across the block from Earl Nash's house, where he had been staying. On cross-examination, Buckles testified he hadn't discontinued the trip with Stewart after the homosexual advances because of the winter weather.

The next day, Buckles used Stewart's car in a robbery of the Farmers State Bank in Rosendale, Missouri. He fled to the state of California, where he was apprehended and was later returned to the Jackson County Jail on federal bank robbery charges.

On May 3, 1978, a body was discovered floating in the Missouri River on the Kansas side near St. Joseph, Missouri. This body was identified as that of Donald Stewart by means of dental records. An autopsy was performed in Kansas and the surgeon performing the same testified that he found "many knife wounds" on both the front and back of the body and lacerations of the palms of both hands. The surgeon stated his opinion that death was caused "by a laceration of the aorta caused by a sharp instrument" and that Stewart "was already dead when he was placed in the water."

On February 3, 1978, while incarcerated at the Jackson County, Missouri jail on the federal bank robbery charge, Buckles was visited by FBI Agent Joseph Holtslag; Missouri Highway Patrol Sergeant Robert Anderson; Holt County Sheriff Melvin Hayzlett; and Andrew County Sheriff Reed Miller. After introductions and Buckles's indication he would see what the officers wanted, an interview took place. Buckles informed these officers he had been advised by his federal defense counsel not to talk with law enforcement officers. The officers then asked: "about the bank robbery?", to which Buckles responded "Yes." The officers then said they were there concerning the whereabouts of Donald Stewart, and then furnished and read aloud a printed *Miranda* warning and waiver of rights, which Buckles refused to sign. Buckles said he did not know any Donald Stewart. Upon his request to see a picture of Stewart, Buckles was shown a photograph of Stewart and was informed the Minnesota trip had been traced. Buckles became emotional and tearful and asked, "Can we make a deal?" When told "No," he signed the *Miranda* waiver and then confessed his relations with Stewart and the homicide.

On February 4, 1978, the Holt County prosecutor filed a felony complaint charging Buckles with murder. On February 21, Buckles wrote a letter to the magistrate judge informing him of his indigency and requesting appointed counsel. On April 25 of the same year, Buckles pleaded guilty to the federal bank robbery charge, was sentenced to fifteen years imprisonment, and his federal defense attorney sent a letter on this date to the state prosecuting authorities requesting a speedy trial of the state charge. Thereafter, Buckles was incarcerated in a federal penitentiary in El Reno, Oklahoma, and an initial detainer was lodged in Washington, D. C. with the attorney general's office on May 5, 1978. On December 29, 1978, Buckles was returned to Holt County for the homicide proceedings and counsel was appointed. On that day motions to suppress evidence and to dismiss were filed.

On February 14, 1979, the motions to suppress and to dismiss were overruled after a preliminary hearing, and the case was ordered to the circuit court for trial. On March 5, 1979, an information charging Buckles with capital murder was filed. He was arraigned and counsel was appointed on March 7, 1978. He filed an application for prohibition, a motion to remand to the magistrate court for a new preliminary hearing and a motion to dismiss. On March

26, 1978, motions to suppress confession and any police testimony in relation thereto, and to dismiss on constitutional grounds were filed.

On April 6, 1979, a hearing was held on the various motions and they and the application for prohibition were overruled; the motion to suppress evidence was taken under advisement.

On April 25, 1979, further motions were filed to remand, dismiss, quash, force disclosure, and suppress evidence, which after hearing were overruled except for the motion to suppress any evidence of the bank robbery which was taken under advisement.

On April 26, 1979, a jury panel was called and during voir dire discharged on the motion of defendant. A second jury panel was summoned and exhausted on challenges for cause. A mistrial was declared and the cause reset. On May 7, 1979, defendant filed an application for change of venue and the case was transferred to Grundy County. The trial commenced in Grundy County on June 13, 1979, resulting in the verdict and judgment.

I

Appellant charges the court erred in submitting any first degree murder instruction (No. 7), asserting there was insufficient evidence to support such submission because it was not shown that the killing occurred during the commission of another felony, and that the court erred in rereading the instruction to the jury after a correction of wording.

The record shows that this case was submitted to the jury under instructions on capital murder, murder in the first degree, murder in the second degree and manslaughter. As noted, the jury found defendant guilty of murder in the second degree and, under the present procedure of bifurcated trials, assessed his punishment at forty years imprisonment, upon which verdict the judgment was entered.

During the reading of the instructions to the jury the court discovered that Instruction No. 7 on first degree murder, through clerical or typing error, omitted the required finding, "If you find and believe from the evidence beyond a reasonable doubt," etc. before the first paragraph of the instruction. The court amended the instruction so as to include this language and reread it to the jury.

■ By the verdict and judgment these contentions became moot. In this state of the record the appellant is in no position to complain of the giving of an instruction on a certain degree of murder when he was not convicted of that offense. *State v. McQueen*, 399 S.W.2d 3, 6, [3] (Mo.1966), *cert. denied* 384 U.S. 977, 86 S.Ct. 1873, 16 L.Ed.2d 687; *State v. Eldridge*, 564 S.W.2d 603, 605[6] (Mo.App.1978), and cases cited. Similarly, the correction of the error in Instruction No. 7 by the court and rereading it to the jury so that it could be properly instructed with respect to first degree murder is moot.

II

■ Appellant charges error to admission of evidence relating to the bank robbery on the day after the homicide. Evidence of an independent and unconnected crime is inadmissible to prove the crime charged, unless it tends to establish motive, intent, absence of mistake or accident, common scheme or plan embracing the commission of multiple related crimes, or the identity of the person charged. *State v. Reese*, 457 S.W.2d 713 (Mo. banc 1970). The test of admissibility is whether the logical relevancy of the separate crime to a particular exception tends to prove a material fact in issue, a judicial question. If this requisite degree of relevancy cannot be clearly perceived, the accused should enjoy the benefit of the doubt and the evidence of a separate crime rejected. *State v. Tillman*, 454 S.W.2d 923, 926[5] (Mo.1970); *State v. Frazier*, 550 S.W.2d 590, 596–97[5–6] (Mo.App. 1977).

The record shows the following which supports the admission of the evidence in question.

Prior to the homicide, defendant told friends he was going to rob a bank, although it is not clear whether the Rosendale Bank was specified; he had no automobile available; he would need transportation to and from Rosendale because it was approximately 20 miles from where he lived or usually stayed; he killed Stewart by means of multiple stab wounds and robbed the bank the next day using the Stewart car, having parked it the night of the homicide in the vicinity of the bank for use as a "getaway" car; he exhibited the car keys to his friends prior to the robbery and stated to them that he was too far into the robbery plans to get out; and, using the money obtained in the robbery he proceeded by air to flee to California. This evidence is competent to prove a "related crime" and was also evidence from which a reasonable inference could be drawn as to intent, motive or premeditation to dispose of Stewart in order to obtain his car to carry out the planned bank robbery.

### III

Appellant asserts his constitutional right to a speedy trial was not accorded him and that his right to due process and counsel under both the United States and the Missouri constitutional provisions were violated.

### A

The record shows that defendant's trial occurred approximately fifteen months after the filing of the original complaint in the magistrate court. This alone, however, does not support the charge that the trial court erred in failing to dismiss the proceedings. Each case where this constitutional point is raised must be viewed against its record.

The courts have established well-defined guidelines for the initial consideration by the trial court and review by appellate courts.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the court set forth the basic considerations to be employed and balanced in such situation: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) resulting prejudice to the defendant. These guidelines have been followed and applied in Missouri in cases where it is claimed a violation of defendant's rights to a speedy trial occurred. *State v. Haddix*, 566 S.W.2d 266, 274[9] (Mo.App.1978). *See also State v. Hollis*, 584 S.W.2d 137 (Mo.App.1979). As to the matter of resulting prejudice to the defendant, the court in *State v. Haddix, supra,* declared that the principal factors to be considered are: (1) prevention of undue or oppressive incarceration; (2) minimization of anxiety; and (3) limitation of defendant's ability to defend himself.

Appellant claims that after he had demanded a speedy trial of the state charge a period of 15 months elapsed until he was first brought to trial. The record discloses that he directed a letter dated February 21, 1978, to the magistrate before whom the original complaint was filed requesting that counsel be appointed to represent him. On April 25, 1978, after guilty plea and sentence on the bank robbery charge, the assistant federal public defender who had represented defendant in the federal case wrote the then prosecuting attorney of Holt County and asked that in view of the lengthy federal sentence that dismissal of the state charge be considered and, if dismissal was declined, that defendant be given a speedy trial. Respondent argues that the defendant at no time asked for or demanded a speedy trial, and the federal public defender was not representing the defendant in the state court action and had no authority to act in his behalf.

While this argument is interesting and somewhat ingenious, it, by no means, is decisive of the appellant's contention. The passage of 15 months between the charge and trial is not *ipso facto* an inordinate or unconstitutional delay. Longer lapses of time have been held not a denial of the constitutional right to a speedy trial. See for example *Barker v. Wingo, supra,* (61 months); and *State v. Hollis, supra,* (21 months).

A search of this record in an attempt to fix the reason or fault for this 15-month delay, leaves some unanswered questions. Accepting the federal public defender's letter of April 25, 1978, as an adequate request for a speedy trial, the only part of the 15-month delay that can be directly charged to actions of the state arose from unusual circumstances. On May 5, 1978, the then Holt County prosecuting attorney attempted to file a request for temporary custody of the defendant under the Uniform Mandatory Disposition of Detainers Law, § 222.080, et seq., RSMo, who was then in the custody of the authorities at the federal penitentiary at El Reno, Oklahoma. Such request was improperly sent to the office of the Attorney General of the United States. The prosecutor left office and on October 22, 1978, a newly appointed prosecuting attorney of Holt County mailed a proper request to the federal authorities at El Reno. Defendant was returned to Holt County on December 29, 1978, counsel was appointed by the magistrate judge, and motions were filed on defendant's behalf. On February 14, 1979, his motions were overruled, he was granted a preliminary hearing and was bound over to the circuit court. An information charging capital murder was filed March 5, 1979, and defendant was formally arraigned on March 7, 1979. After the filing of various motions, they were heard and disposed of, and his first trial, resulting in a mistrial, commenced April 25, 1979.

■ Thus it appears that of the 15 months, six months, May 5, 1978, to October 22, 1978, was the result of the inadvertent and mistaken filing of the proper detainer papers with the wrong authorities. Under such circumstances, the first three tests or guidelines in Barker v. Wingo, supra, did not require the dismissal of this prosecution. The last or fourth factor in Barker v. Wingo, supra, prejudice to the defendant as further refined in State v. Haddix, supra, (1) prevention of undue and oppressive incarceration; (2) minimization of anxiety; and (3) limitation of defendant's ability to defend himself, must be reviewed in the light of the record.

The transfer of defendant from El Reno, Oklahoma, to Missouri under proper request in May, 1978, rather than October, 1978, would have in no degree prevented his incarceration in Missouri, since he was already serving a 15-year sentence, or in any way minimized his "anxiety."

Did the trial delay work to the prejudice of defendant (consideration 4 in Barker v. Wingo, supra) in that his ability to defend himself was thereby limited (consideration 3 in State v. Haddix, supra)?

■ The resulting prejudice to require reversal must be actual prejudice apparent on the record or by reasonable inference—not speculative or possible prejudice. United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). Because defendant was the only witness to the facts and circumstances surrounding the death of the victim, he had confessed guilt prior to trial and was urging self-defense, and because he testified in substantial accordance with his prior confession, speculation must be employed to conclude that he was prejudiced by his incarceration in El Reno, Oklahoma, during the 6-month period involved instead of in Holt County, Missouri.

Further, defendant was represented by appointed counsel from December 29, 1978, the date when he personally appeared before the magistrate court in Missouri, to the present date. He was ably represented, both in the early proceedings, the trial, and on this appeal. His counsel displayed not only energy and ingenuity, but also afforded defendant every legal defense permissible under the law.

**B**

Appellant charges the court erred in overruling his motion to dismiss because of the failure of the state to bring him to trial within the time limits required by Section 222.160 RSMo, which provides that whenever a detainer is lodged against a defendant imprisoned in a sister (party) state, he must be brought to trial within 180 days of the date of his request for final disposition of

the case delivered to the appropriate prosecuting officer and the court. Appellant asserts further that he complied substantially with the terms of that law and that the state failed to bring him to trial within the time specified by the statute.

He asserts further error in overruling his motion to dismiss as a deprivation of his federal and state constitutional right to counsel at every critical stage of the prosecution, because counsel was not appointed for him until (12/29/78) eleven months after his written request for appointed counsel (letter dated 2/21/78).

Involved here is the procedure to be followed under the Uniform Mandatory Disposition of Detainers Law, Section 222.080, *et seq.*, RSMo 1978. Section 222.160 thereof invokes the 180-day trial rule if triggered by a proper request followed by the proper procedures.

The request must: be caused to be delivered to the prosecuting officer and appropriate court where trial is sought; seek a final disposition of the charges; and, be accompanied by a certificate of the official having custody of the prisoner together with all pertinent information concerning his incarceration. The Act clearly provides that the petitioner deliver such notice and request to the official "having custody of him" who in turn is charged with the duty to forward the request, together with the supporting documents required, to the appropriate prosecuting official and court by registered or certified mail, return receipt requested. Section 222.160, Article III. Further, the Act specifically provides that these procedures are appropriate and effective to commence the running of the 180-day limit for trial only when "a detainer has been lodged against the prisoner." Section 220.160, Article III (1).

These procedures are reasonable and proper requirement in the interest of orderly jurisdictional and custodial process. *State v. Patterson*, 508 S.W.2d 304, 306[2] (Mo.App.1974); *State v. Savage*, 522 S.W.2d 144, 147[2, 3] (Mo.App.1975); *State v. Soloway*, 603 S.W.2d 688, 690[2, 3] (Mo.App. 1980).

As shown by the record, the letters of February 21, 1978 (defendant's request that counsel be appointed) and the letter of April 25, 1978, (assistant federal public defender's advice of defendant's plea and sentence on federal charge, request for dismissal of state charge or for speedy trial) did not constitute compliance with the procedural requirements of the Act. This is apparent because the defendant on those dates was not in the custody of the El Reno, Oklahoma federal authorities nor, of course, had any detainer been filed against him by the state.

Appellant's contention is that his attempt at compliance by the letter of April 25 should be viewed as substantial compliance triggering the 180-day time period, especially because he was without state appointed counsel at the time of the request and during his incarceration up until December 29, 1978. He relies on *State ex rel. Saxton v. Moore*, 598 S.W.2d 586 (Mo.App.1980), clearly distinguishable and not authoritative here. Saxton was imprisoned with a detainer lodged at the time of his letter request for final disposition. The prosecution responded with a letter containing the appropriate forms for him to fill in. These were filled out and returned to the prosecution, but no copy was sent to the appropriate court. The prosecution then accepted temporary custody which was ineffective and caused delay because no offer of temporary custody had been issued by the prison officials. The court stated, l. c. 590, that good faith substantial compliance, omitting "nothing essential to the Agreement's operation," was sufficient to trigger the Act. The failure to notify the appropriate court was held waived by the prosecution's acceptance of custody and stated intention therein to bring defendant to trial within the time specified by the Agreement. The preliminary writ of prohibition, a trial not being had within 180 days of the acceptance of temporary custody and waiver of notice to the appropriate court, properly was made absolute.

C

Appellant asserts in support of his alleged unconstitutional denial of the right to

counsel at critical stages of prosecution, prejudice from the failure to locate potential witnesses, failure to obtain a second pathological opinion as to the nature of the knife used in the killing and to locate certain witnesses in Arizona who were not later available or could not be located.

■ The general rule of law is that the defendant is entitled to assistance of counsel at all critical stages of prosecution, and this right attached at the pleading stage. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *State v. Quinn,* 594 S.W.2d 599, 604[10] (Mo. banc 1980); *State v. Alberts,* 519 S.W.2d 562, 565[3] (Mo.App.1975).

■ Appellant's claim is not persuasive. The purpose of the right to counsel is to ensure a fair trial. The transcript shows two appointed counsel who made extensive preparation, filed pretrial motions, took depositions, gave effective trial representation and effective post trial work. The prejudice charged by appellant to the temporary lack of counsel at any critical stage of the proceedings is speculative at most. That an additional pathological opinion or interviews with the unfound witnesses may have benefitted defendant, is not real prejudice, and to order a new trial on speculation that earlier-appointed counsel could have provided these benefits is unwarranted.

## IV

Appellant urges this Court to abandon the rule in homicide cases involving an issue of self-defense which limits a homicide victim's character evidence to that which shows a reputation for known turbulence and violence as unduly restrictive.

■ More specifically, he asserts that the state "opened up" the matter of the victim's "character" when the victim's den-

tist testified he had seen the victim in church and that, therefore, the court erred in sustaining the state's motion to limit testimony to the long-established rule in homicide-self-defense cases to known turbulent and violent reputation of the victim, which rule he characterizes as unduly and "unreasonably restrictive" and one that "should be abandoned." He asserts that under this rule the trial court precluded him from presenting evidence that the victim was "insane" at the time he was killed which corroborated the defendant's theory of self-defense and was admissible rebuttal evidence to the "state's evidence of victim's good character." On the issue of self-defense there can be no doubt of the rule that evidence of the deceased's reputation for turbulence and violence is admissible as relevant to show who was the aggressor and whether a reasonable apprehension of danger existed; but such evidence must be proved by general reputation testimony, not specific acts of violence, and defendant must show he knew of such reputation when the issue is reasonable apprehension. *State v. Maggitt,* 517 S.W.2d 105, 107[1] (Mo. banc 1974); *State v. Robinson,* 556 S.W.2d 73, 74[1, 2] (Mo.App.1977); and *State v. Howard,* 564 S.W.2d 71, 76[7] (Mo. App.1978).

■ Appellant contends the present rule operated to deprive him unfairly of corroborative evidence as to who was the aggressor in this homicide. In closing argument the state emphasized that self-defense was not plausible in view of defendant's larger physical stature, and further argued this was a planned killing. Appellant contends that his offer of proof, which included fellow schoolteachers' statements and a hospital record indicating the victim's instability and sometimes odd behavioral patterns, all of which offers dated back several years, deprived the jury of information making the defense of the victim's initial aggression more believable in light of the evidence already adduced as to his being seen at church. Appellant further asserts, that because the victim's mental state was not clearly pictured, defendant was unable to

present a complete, coherent, and reasonable defense.

Appellant cites authorities for the proposition that in homicide cases involving self-defense, the rule should be expanded to allow evidence of the decedent's mental illness on the issue of who was the aggressor. In *Evans v. United States*, 277 F.2d 354[1–3] (D.C.Cir.1960), a conviction was reversed and remanded for exclusion of evidence of deceased's mental insanity known by the deceased's wife. This is one of a line of cases admitting specific acts of violence as well as general reputation evidence; however, the specific grounds of the reversal are that the testimony would show the deceased was aggressive when drunk. In *State v. Shahane*, 56 N.D. 642, 219 N.W. 132, 134[5] (1928), it was held that evidence that deceased was insane and dangerous when insane was similar to evidence of aggressiveness when intoxicated, and should similarly be admitted. Both of these cases involve the element of violence of the deceased, which does not directly appear in this record. Appellant's contention fails because none of the tendered offers of proof fit the requirement that the evidence be of deceased's tendency to be violent and turbulent. The present rule, based on relevancy, is well founded and generally accepted, and should not be abandoned.

## V

This is the certified question. Appellant contends the admission of his confession was erroneous as, under the totality of the circumstances, he did not voluntarily, knowingly, and intelligently waive his right to be silent or consult with an attorney before making the confession. The facts and sequence of defendant's interview by police officials on February 3, 1978, at the Jackson County Jail have been noted above and need not be repeated.

█ Once the admissibility of a statement or confession has been challenged, the burden of proving its voluntariness falls upon the state, which must show voluntariness by a preponderance of the evidence. *State v. Olds*, 569 S.W.2d 745, 751[4] (Mo. banc 1978). The test for voluntariness is whether the totality of the circumstances deprived defendant of a free choice to admit, to deny, or to refuse to answer, and whether physical or psychological coercion was of such a degree that defendant's will was overborne at the time he confessed. *State v. Higgins*, 592 S.W.2d 151, 158[8] (Mo. banc 1979).

█ In the totality of circumstances in this case, it is established that defendant was counselled not to talk about the bank robbery charge, and this was respected by the officers. It is equally established that Buckles subsequently and voluntarily engaged in a discussion of Donald Stewart, distinct from the robbery charge. He asked to see a photograph of Stewart, became emotional, asked to make a "deal," and confessed to Stewart's murder, after which he executed a waiver of his rights against interrogation without presence of counsel.[1] It was not improper for the officers to continue the interrogation of defendant

1. *Compare*

    *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). This Court finds Buckles's case inapposite on the facts surrounding the circumstances incident to the confession of *Edwards* and in that area not controlling here. A significant finding of the majority in *Edwards* states:

    We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.

    *Id.* at 484–85, 101 S.Ct. at 1884–85. As set forth in the body of this opinion Buckles's conduct upon the occasion of the interrogation brings him squarely within the exception noted in the above quotation from *Edwards*.

    *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981). In *Oldham* the Court quoted with approval the above rule and exception in *Edwards* as the law in Missouri. Oldham refused to make a statement, requested an attorney and did not in any way initiate further communication from which the challenged statement was taken, in which circumstances it was improper to admit the statement.

with respect to homicide after clarifying they were not interested in the bank robbery. *See United States v. Johnson*, 529 F.2d 581, 584 (8th Cir. 1975). This record provides a basis for the trial court's ruling in satisfaction of and free of conflict with *State v. Oldham, supra*. Conflicts, if any, in the evidence were for the trial court to resolve, and this Court defers to the trial court's superior position in which to determine credibility. Mo.Dig., Crim.Law, Key Nos. 414, 532(2) and 1153(1).

## VI

■ Appellant argues that his confession was obtained in violation of Disciplinary Rule 7–104(a)(1), Rule 4, Code of Professional Responsibility; that the resulting evidence was illegally obtained, and therefore not properly available for use by the prosecution. Professional responsibility of attorneys is a factor to be considered in evaluating the admissibility of confessions, but once waiver is shown, the Code of Professional Responsibility has no role in admissibility. *State v. McConnell*, 529 S.W.2d 185, 189[4] (Mo.App.1975). Appellant's argument is that it was the trial court's duty under the Code to prohibit the state from using any evidence obtained from the statement obtained in violation of this rule.

Appellant applied for a writ of prohibition against the use of this statement and the evidence obtained on the same grounds. The motion was quashed; appeal taken to the Supreme Court and transfer to the Court of Appeals where order was entered sustaining the trial court's quashing of the motion without an opinion (*State ex rel. Gurney Edward Buckles v. Wilson*, WD 30, 873). Assuming presence of some disciplinary rule violation, no precedent is cited or found incorporating this type "fruit of the poisonous tree" approach to excluding the obtained evidence. The *McConnell* rationale excluding disciplinary rule considerations from admissibility questions where waiver and voluntariness appear is applicable.

## VII

■ Appellant's contention that the trial court erroneously failed to sustain the motion for directed verdict of acquittal of capital murder for failure to prove premeditation is without merit. Under the prosecution's theory, the evidence clearly supported the inference that Buckles planned to kill, rob, and use the car of Stewart in the "planned" bank robbery. *See State v. Smart*, 485 S.W.2d 90, 93[2] (Mo.1972) for the proposition that premeditation for any duration, however brief, is sufficient. As pointed out in I, *supra*, error, if any, would not be prejudicial regarding this submission because defendant was not convicted of capital murder.

## VIII

■ Appellant contends the state failed to meet its burden of proof regarding self-defense and second degree murder. Once a *prima facie* showing of self-defense is made, the burden is on the state to rebut by showing the killing was not justifiable. *State v. Ford*, 491 S.W.2d 540, 542[3] (Mo. 1973). The state met this burden. Under the evidence favorable to the verdict, defendant was bigger and stronger than the victim, warned him he would take the knife away and use it on him, was not wounded by the victim, and after taking the knife defendant no longer experienced any fear. Nevertheless, he did not try to utilize any available avenue of escape or avoidance, ignored the victim's plea with defensively raised hands to stop, stabbed him repeatedly both in and out of the car, placed the victim's body in the river, and fled.

■ Similarly, the state met its burden of providing evidence that appellant did not kill out of fear, anger, or agitation suddenly provoked by the victim's unexpected acts. *State v. Holt*, 592 S.W.2d 759, 764[2] (Mo. banc 1980). The previously discussed evidence on lack of self-defense and premeditation is sufficient to support these submissions and orders overruling defendant's motions for acquittal.

The judgment below is affirmed.

DONNELLY, C. J., and RENDLEN, WELLIVER, MORGAN and HIGGINS, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J.

SEILER, Judge, dissenting.

I respectfully dissent. Appellant's confession should have been suppressed. It was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981).

Appellant had been arrested in Las Vegas, Nevada, on January 20, 1978, by agents of the Federal Bureau of Investigation for robbery of the Farmers State Bank in Rosendale, Missouri, which occurred on January 16, 1978. A federal bank robbery indictment was returned in Kansas City on January 18, 1978. Also pending against appellant was a three count felony complaint in Holt County, Missouri, filed January 21, 1978, wherein appellant was charged with stealing $4,200 from the Farmers State Bank, as well as with armed criminal action and tampering with Stewart's automobile.

Upon his arrest in Las Vegas, appellant was given his *Miranda* warnings, declined to give a statement, and requested an attorney. He was returned to Kansas City where, on February 2, 1978, he was arraigned by the federal authorities on the bank robbery charge, and appointed a federal public defender. Defendant talked with his lawyer that same day. At this point, under *Edwards v. Arizona, supra,* and *State v. Oldham, supra,* defendant was not subject to further interrogation by the police unless defendant himself initiated contact with the police. The following day, February 3, 1978, Sergeant Anderson of the Missouri Highway Patrol, Agent Holtslag

of the Federal Bureau of Investigation, and two county sheriffs went to the Jackson County jail where appellant was being held to interrogate him. This contact was initiated by the officers, not appellant, and "Buckles' indication [that] he would see what the officers wanted" cannot be taken as an initiation by defendant of exchanges with the officers.

Agent Holtslag, who was the chief investigating officer in regard to the bank robbery, was present for possible additional federal violations and to assist in questioning appellant, because, as he put it, he had "the most well-rounded knowledge of the events" prior to the bank robbery. Sergeant Anderson was there to investigate the bank robbery and what he believed to be a possible murder. One Donald Stewart, a resident of Columbia, Missouri, had not been seen since January 13, 1978, and Stewart's car, a Chevrolet Nova, had been used in the bank robbery getaway and then abandoned. Each of the four officers was a veteran officer, their combined experience totaling 40 to 50 years in law enforcement work. The Federal Bureau of Investigation had solved the bank robbery (which the agent said was not well planned or professionally executed) in less than forty-eight hours and, as said, within four days had located and arrested appellant.[1] It was the theory of the state that appellant had killed Stewart to obtain the automobile to use in the bank robbery, so the officers, while professing no further interest in the bank robbery, were in fact desirous of connecting the two (which the state did at trial to prove intent, motive and premeditation. See part II of principal opinion). The officers, either singly or in combination, were aware of the foregoing as they embarked upon the interrogation of appellant.

Sergeant Anderson, who conducted the interrogation, knew before going to the jail that Buckles was represented by counsel, but made no effort to contact appellant's

---

1. On April 25, 1978, appellant pleaded guilty in federal court to the bank robbery charge and was sentenced to fifteen years.

lawyer before the interview. It is unclear from the record whether the other law enforcement officers also knew this prior to the first few minutes of the interview, but it is undisputed that appellant before making any statements whatsoever told all four investigators at the outset that he was represented by counsel who had advised him "not to talk to any law enforcement officers." One of the officers then asked, "[A]bout the bank robbery?" to which Buckles replied, "Yes."[2] Buckles was again given his *Miranda* warnings, asked to sign a waiver of his rights and refused to do so. After further questioning, he made incriminating statements concerning the murder of Stewart and then signed the waiver. At his trial, over objection and motion to suppress, his statements were introduced against him.

On appeal, appellant claims the trial court erred in overruling his motion to suppress his February 3 statement and admitting same in evidence, because taken in violation of his fifth, sixth, and fourteenth amendments right to counsel. "[O]nce a defendant has challenged the admissibility of a statement or confession made while in police custody, the burden is on the state to demonstrate its elicitation comported with controlling constitutional requirements and that the statement was voluntarily made." *State v. Higgins*, 592 S.W.2d 151, 158 (Mo. banc 1979).

*Miranda* held "that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the [fifth amendment] privilege ...." *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 1626, 16 L.Ed.2d 694 (1966). The fifth amendment right to counsel depends on in-custody interrogation, not on a charge or charges having been filed. The Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), point-

ed out that the Arizona Supreme Court in concentrating on the voluntariness of the defendant's confession, determined by the totality of the circumstances, misunderstood, as does the principal opinion herein in its reliance on the totality of the circumstances, "the requirement for finding a valid waiver of the right to counsel, once invoked." That depends, instead, upon a showing that defendant "understood his right to counsel and knowingly and intelligently relinquished it." *Id.* at 484, 101 S.Ct. at 1884. Edwards established an objective means of determining whether the right to counsel, once invoked, has been honored by the interrogating officers. The Court stated that, once a suspect has requested counsel, he cannot be subject to further interrogation without counsel, unless he initiates the contact. *Id.* at 484–85, 101 S.Ct. at 1884–85. Establishment of this easy-to-follow rule gives lower courts guidelines to follow and eliminates the need for a case-by-case analysis which results in "inconsistent results based on virtually indistinguishable facts." Note, *Edwards v. Arizona*: The Burger Court Breathes New Life into *Miranda*, 69 Cal.L.Rev. 1734, 1744 (1980–81). This court in *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981) applied *Edwards* for the first time, stating:

> Resolution by this Court of the issue presented has been simplified by the guidance now found in the very recent case of *Edwards v. Arizona*, 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378] (1981), which was not available to the trial judge, the parties at time of submission nor the Western District at time of transfer.

*Id.* at 648–49. The *Oldham* court formulated the following test, which consists of asking two questions, to determine whether a defendant's right to counsel has been violated: "(1) Did the accused, after having expressed a desire for assistance of counsel, *initiate* further communication? (2) If the

---

**2.** One of the attorneys for the state erroneously attempted to argue at the hearing on the motion for new trial that the question put to appellant after he said his lawyers had told him not to talk to any law enforcement officers was

"if that was *just* concerning the bank robbery." However, it is to be noted that the question actually put to appellant was not so limited, a fact not discussed or considered by the principal opinion.

answer to one is 'yes' did the accused do so voluntarily, knowingly and intelligently?" *Id.* at 649. *Oldham* further holds that if the answer to (1) is no the inquiry ends and the confession is inadmissible.

Here, the accused had expressed a desire for assistance of counsel, thereby expressing his inability to act in his own best interests, and was in fact represented by appointed counsel. The fact that there were two sovereigns prosecuting appellant under different charges and that his appointed counsel was for the federal charge does not change this. To make that the determinative factor would be to encourage circumvention of a defendant's constitutional rights. *United States v. Downing*, 665 F.2d 404, 407 (1st Cir. 1981). It would permit officers to interrogate a defendant about any suspected criminal activity except the specific charge for which counsel had been appointed. Whether his appointed counsel would have defended appellant in court with respect to the state felony charges or not, the federally appointed counsel was the only counsel appellant had at the time.[3] This fact was known to the interrogating officers prior to the questioning that elicited the incriminating responses, as was the fact that there were both state and federal charges pending against appellant. There is no reason why appellant's appointed counsel, at this early stage, would limit his advice not to talk to law enforcement officers to the federal bank robbery charge when various state charges interrelated with the bank robbery and growing out of it were pending, or why the experienced officers would expect otherwise. There is no question that the officers, not the accused, initiated the further communication which took place at the Jackson County jail. Because the officers initiated the interview after appellant had invoked his fifth amendment right to counsel, it is unnecessary to answer the second question set out in *Oldham*.

Although the principal opinion recognizes that once a defendant is represented by counsel he is not subject to further questioning unless he initiates further communication with his interrogator, *Edwards v. Arizona, supra*, it avoids application of the rule by taking the position that appellant never invoked his right to counsel for anything other than federal bank robbery charge. This ignores appellant's original request for counsel upon arrest, his subsequent interview with counsel and the blanket advice not to talk to law enforcement officers, and requires that appellant's answer "yes" to the officers' question "About the bank robbery?" be treated as amounting to more than a direct answer to the precise question put; that it be taken, first, as amounting to the officers' being assured by appellant that his lawyer said it was all right to talk to them about any suspected crimes other than the bank robbery (even though the officers were highly suspicious, if not convinced, that the car theft and disappearance of its owner were directly connected to the bank robbery) and, second, a willingness on appellant's part, despite his having earlier requested counsel, now to submit to questioning without advice of counsel as to all else other than the bank robbery.

The facts are that a three count felony complaint had been filed by the Holt County prosecuting attorney on January 21, 1978, and was pending against appellant when counsel was appointed for him by the federal magistrate on February 2, 1978, on which day appellant talked with his lawyer. These facts were known to the law enforcement officers. There is nothing in the record to support the idea that appellant's counsel was not aware of the three count state felony complaint, all counts of which grew out of the same bank robbery, or that counsel limited his advice to advising appellant not to talk about the bank robbery. On the contrary, the record shows that appellant told the officers at the outset of the

---

**3.** In fact, counsel was not appointed for appellant on the state charge until December 29, 1978. His federal counsel acted on behalf of appellant on the state charges by requesting

dismissal of the state charge on April 25, 1978, and asking if that were not done that appellant be given a speedy trial.

February 3, 1978, interrogation that his lawyer had advised him not to talk to law enforcement officers.

Why was the question, "About the bank robbery?", put to appellant? It is fair to say the federal and state officers, who were working as a team, knew that appellant had invoked his fifth amendment right to counsel (he told them he had a lawyer) and that his sixth amendment right to counsel had attached (Agent Holtslag, in particular, testified about this), that appellant had been advised in broad terms not to talk, and that they needed a waiver if they were to interrogate defendant further, regardless of whether the questions were as to federal or state suspected crimes. The question put was deft and clever, but it produced only a colorable waiver, far short of meeting the government's burden of showing a knowing, intelligent and voluntary relinquishment or abandonment by appellant of a known right or privilege. *Edwards v. Arizona*, 451 U.S. at 482, 101 S.Ct. at 1883. The question did not call for a response from appellant as to whether counsel had said it was all right to talk with law enforcement officers about anything *but* the bank robbery. It does not follow that because counsel said not to talk about the bank robbery that counsel had said it was all right to talk about anything and everything else. That question was never put to appellant. Appellant answered the question put. He did not say he was free or willing to talk about matters other than the bank robbery.

If appointed counsel had done his job (and we cannot assume counsel was substandard or did not give appellant sound advice), appellant would have answered such a question, had it been put to him, in the negative. We all know that his lawyer would not have told him to talk to law enforcement officers as to the whereabouts of the missing man whose automobile he had stolen to commit the bank robbery, if for no other reason that that it might bear on the issues in the bank robbery case.[4] The principal opinion proceeds as if the question put to appellant about not talking to the officers were "Only about the bank robbery?" or "Just about the bank robbery?". But that was not the question asked. Significantly, the officers did not ask appellant whether counsel had said it would be all right for appellant to talk with law enforcement officers as to the whereabouts of Donald Stewart.

Although the principal opinion attempts to distinguish *Edwards* and *Oldham* from the instant case, the facts in all three cases are quite similar. The defendants in the three cases were all subjected to custodial interrogation. All three defendants during an earlier interrogation had indicated that they wanted to exercise their fifth amendment right to counsel. Subsequently, law enforcement authorities initiated contact with the defendants—none of whom during the *subsequent* interrogation requested counsel—and the contact resulted in incriminating statements which, in *Edwards* and *Oldham* on similar facts to those before us, were held inadmissible.

The principal opinion also relies on the fact that appellant signed a waiver. Such reliance is misplaced. In the *Oldham* case, the defendant also signed a waiver.[5] This did not avail the state, once a violation of the *Edwards* rule occurred. An express written waiver does not inevitably establish waiver. The question remains whether defendant in fact effectively waived his *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). *Edwards* also holds that "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484, 101 S.Ct. at 1884.

---

4. "[T]he primary office performed by appointed counsel parallels the office of privately retained counsel.... His principal responsibility is to serve the undivided interests of his client." *Ferri v. Ackerman*, 444 U.S. 193, 204, 100 S.Ct. 402, 409, 62 L.Ed.2d 355 (1979).

5. This fact is not set out in the opinion, but it appears in the record from the testimony of the officer who interrogated appellant.

It is true that appellant *after* the officers initiated their interrogation of him about the disappearance of the victim, asked to see a photograph of the victim, but this was a response from appellant to the interrogation initiated by the officers and constitutes neither an initiation of further communication by the appellant in the sense of *Edwards* nor a predicate for finding a subsequent waiver. Nor can Buckles' inquiry as to whether they could "make a deal" constitute a waiver, as it was clearly in response to the police initiated statement that the Minnesota trip of Buckles and the victim had been traced. One of the necessary facts that must be found before the waiver question is even addressed is that "the accused, not the police, reopened the dialogue with the authorities." *Id.* at 486 n.9, 101 S.Ct. at 1885 n.9. That necessary fact is missing here. Under *Edwards*, once appellant invoked his right to counsel, as it is conceded he did here, there was no waiver because the subsequent interrogation was police initiated.

Not only is the first test of *Oldham* not met here, but the second test is not, either. Despite the principal opinion's invocation of "totality of circumstances", there is no evidence that appellant initiated further communication with the officers or that if he did so it was done voluntarily, knowingly and intelligently. Instead, appellant did no more than react to the accusations of the officers—that they were there to talk about Donald Stewart and that they knew about the Minnesota trip taken by the two. Appellant's reactions to this pressure cannot be considered a waiver of his *Miranda* rights, no matter if the trial court did find otherwise. The principal opinion is in error in saying it is a matter of credibility. On the stated facts, there was no valid waiver of his right to counsel, earlier invoked. There are no facts present showing that appellant intelligently and knowingly relinquished his right to counsel with respect to the homicide under investigation. He was never asked about this specifically or given a chance to refuse counsel before committing himself.

The trial court erred in admitting into evidence, over objection, the incriminating statements obtained in violation of appellant's fifth and fourteenth amendment rights and the judgment should be reversed and the cause remanded for a new trial.