# FERRI *v.* ACKERMAN

No. 78–5981.  Argued October 2, 1979—Decided December 4, 1979

STEVENS, J., delivered the opinion for a unanimous Court.

*Julian N. Eule,* by appointment of the Court, 440 U. S. 970, argued the cause and filed briefs for petitioner.

*John P. Arness* argued the cause for respondent. With him on the brief were *David J. Hensler, Allen R. Snyder,* and *Ned J. Nakles.**

MR. JUSTICE STEVENS delivered the opinion of the Court.

The question is whether an attorney appointed by a federal judge to represent an indigent defendant in a federal criminal trial is, as a matter of federal law, entitled to absolute immunity in a state malpractice suit brought against him by his former client.

On August 28, 1974, a federal grand jury for the Western District of Pennsylvania named petitioner as a defendant in five counts of a nine-count federal indictment alleging that he had participated in a 1971 conspiracy to construct and use a bomb in violation of various federal statutes.[1] In due course, the District Court appointed respondent to serve as petitioner's counsel pursuant to the Criminal Justice Act of 1964.[2] Respondent represented petitioner during pretrial pro-

---

*Benjamin Lerner, Douglas Riblet,* and *Howard B. Eisenberg* filed a brief for the National Legal Aid and Defender Association as *amicus curiae* urging reversal.

*Dante G. Bertani* filed a brief for the Committee of Pennsylvania Public Defenders as *amicus curiae* urging affirmance.

[1] The relevant sections, codified in the Criminal Code and the Internal Revenue Code, are: 18 U. S. C. §§ 2, 371, 844 (i); 26 U. S. C. §§ 5821, 5822, 5861, 5871.

[2] 18 U. S. C. § 3006A. The record indicates that petitioner had previously been represented by two other lawyers. An action against the first

ceedings and a 12-day trial. The jury found petitioner guilty on all counts; the judge imposed a sentence of 20 years on the conspiracy and bombing counts and an additional 10 years on the counts charging violations of the Internal Revenue Code. The judgments of conviction were affirmed summarily by the Court of Appeals for the Third Circuit.[3]

While that appeal was pending, on March 4, 1976, petitioner filed a "complaint in negligence" against respondent in the Court of Common Pleas for Union County, Pa.[4] The complaint described 67 different instances of alleged malpractice in respondent's conduct of the federal criminal trial and prayed for the recovery of substantial pecuniary damages.[5] Respondent filed a demurrer, asserting that the complaint failed to state a cause of action and that respondent was immune from any civil liability arising out of his conduct of petitioner's defense.

Petitioner thereafter filed a "Traversal Brief" in which he argued that the sufficiency of the malpractice complaint was supported by various sections of the Pennsylvania Rules of Civil Procedure and the Pennsylvania Constitution.[6] In that brief petitioner added a claim that respondent had negligently

---

for malpractice is still pending; the second was permitted to withdraw when respondent was appointed to represent petitioner.

[3] *United States* v. *Ferri,* 546 F. 2d 419 (1976).

[4] Because venue was improper, the case was later transferred to the Court of Common Pleas for Westmoreland County.

[5] The prayer is somewhat ambiguous. For example, in one paragraph, petitioner, suing on behalf of his former wife as well as himself, asked for "double and contingent damages sustained as a direct result from the expenditure of funds and anxieties endured in the amount of Six Hundred Thousand Dollars ($6,000,000.oo) [*sic*] jointly and or severally as compensation for all." App. 20. His former wife, however, wrote to the clerk demanding that she be withdrawn as a plaintiff in what she characterized as "an abhorrent action." *Id.,* at 23.

[6] See *id.,* at 31.

failed to plead the statute of limitations as a bar to the Internal Revenue Code counts of the indictment.[7]

Without ruling on its sufficiency, the Court of Common Pleas, sitting en banc, dismissed the complaint on the ground that decided cases and strong public policy required that a lawyer appointed to represent an indigent defendant in a federal trial must be immune from liability for damages. The court cited one Pennsylvania case [8] but relied primarily on federal authorities for its conclusion.[9] By a divided vote, the Pennsylvania Supreme Court affirmed the order of dismissal, squarely resting its decision on federal law.

Because the case concerned a claim of immunity by a participant in a federal proceeding, the Pennsylvania Supreme Court believed that it was required to look to federal law to determine whether immunity exists and, if so, its nature and

[7] Petitioner's claim is that the 3-year statute of limitations contained in 26 U. S. C. § 6531 applies to the Internal Revenue Code counts. A 5-year period applies to the other counts. 18 U. S. C. § 3282. According to the indictment, the bombing occurred on August 26, 1971. The indictment was filed on August 28, 1974. Absent any tolling, petitioner asserts that the Internal Revenue Code counts were therefore time barred. Because of the failure by respondent (or either of petitioner's two previous lawyers, see n. 2, *supra*) to plead the statute of limitations prior to trial, petitioner may be subject to an additional 10 years in prison. The Court of Appeals for the Third Circuit rejected the statute-of-limitations argument in its unpublished order, since it was raised for the first time on appeal. See App. 39. It is our understanding that the validity of the additional 10-year sentence has not yet been determined in any collateral proceeding.

[8] *Reese* v. *Danforth,* Lancaster County, 131 June Term, 1976, aff'd *per curiam,* 241 Pa. Super. 604, 360 A. 2d 629 (1976) (holding county public defenders immune from state malpractice suits). That case was reversed by the Supreme Court of Pennsylvania after we heard oral argument in this case. 486 Pa. 479, 406 A. 2d 735 (1979).

[9] The court also declined to rule on respondent's contention that the state court had no jurisdiction in an action based on ineffective assistance of counsel in a federal court because that issue could be raised on direct appeal in the criminal case or by way of collateral attack on the conviction. See App. 42.

scope.[10]   After reviewing federal cases holding that the common-law doctrine of judicial immunity has been embraced in the federal system and encompasses prosecutors and grand jurors as well as judges, the court concluded that the justification for the immunity—the concern that the threat of harassment by unfounded litigation might impair the public officer's performance of his official duties—was equally applicable to defense counsel as participants in judicial proceedings.   The court held that the privilege was absolute and therefore applied even to a claim of gross negligence and even though the allegation of malpractice did not concern an exercise of counsel's discretion.

The two dissenting justices agreed that federal law was applicable, but regarded appointed counsel as more analogous to privately retained counsel than to a federal officer such as a prosecutor.   Because those who can afford to retain counsel of their own choosing have a remedy for malpractice, the dissenters felt that the denial of a comparable remedy for the indigent would establish a lower standard of care for appointed counsel.

The narrow issue presented to this Court is whether federal law in any way pre-empts the freedom of a State to decide the question of immunity in this situation in accord with its own law.   We are not concerned with the elements of a state cause of action for malpractice and need not speculate about

---

[10] "Since we are here concerned with an asserted immunity protecting a participant in a federal legal proceeding, we are required to look to the federal law to determine whether it exists and if it does, its nature and scope. *Howard v. Lyons,* 360 U. S. 593 . . . (1959). *See also Carter v. Carlson,* 144 U. S. App. D. C. 388, 391–392, 447 F. 2d 358, 361–62 n. 5 (1971); *Chandler v. O'Bryan,* 445 F. 2d 1045, 1055 (10th Cir. 1971); *Garner v. Rathburn,* 346 F. 2d 55, 56 (10th Cir. 1965).   As noted by the United States Supreme Court in *Howard v. Lyons, supra,* the very nature of a ruling of privilege requires reference to the law of the sovereign creating it for a determination of its nature and scope." 483 Pa. 90, 93, 394 A. 2d 553, 555 (1978).

whether a state court would consider petitioner's allegations sufficient to establish a breach of duty or a right to recover damages.[11] Nor are we concerned with the question whether Pennsylvania may conclude as a matter of state law that respondent is absolutely immune.[12] For when state law creates a cause of action, the State is free to define the defenses to that claim, including the defense of immunity, unless, of course, the state rule is in conflict with federal law. U. S. Const., Art. VI, cl. 2.

For the purposes of our analysis, it is appropriate to assume that petitioner is entitled to prevail as a matter of state law, and to ask whether federal law requires a State to accept respondent's defense of absolute immunity. We may begin the inquiry by noting that there are separate federal interests that arguably could support the application of a separate federal rule in cases of this kind. A federal statute provided the basis for respondent's appointment and compensation, and he participated in a federal judicial proceeding as an "officer" of the federal court. The identification of those federal interests does not, however, demonstrate that an applicable federal rule of law has been adopted by Congress or recognized by this Court.[13] We therefore must consider whether respondent's immunity claim is supported by (1) the enactment of the Criminal Justice Act of 1964 or (2) our cases considering the immunity of federal officers for the performance of their assigned duties.

---

[11] Cf. *Walker* v. *Kruse,* 484 F. 2d 802 (CA7 1973).

[12] See *Reese* v. *Danforth,* 486 Pa. 479, 406 A. 2d 735 (1979); n. 8, *supra.*

[13] When federal law is the source of the plaintiff's claim, there is a federal interest in defining the defenses to that claim, including the defense of immunity. See, *e. g., Lake Country Estates* v. *Tahoe Regional Planning Agency,* 440 U. S. 391, 404; *Imbler* v. *Pachtman,* 424 U. S. 409, 417–419; *Pierson* v. *Ray,* 386 U. S. 547, 554; *Tenney* v. *Brandhove,* 341 U. S. 367, 376. That interest, of course, is not present in a case, such as this, arising under state law.

# I

The Criminal Justice Act of 1964 was enacted to provide compensation for attorneys appointed to represent indigent defendants in federal criminal trials.[14]   In response to evidence that unpaid appointed counsel were sometimes less diligent or less thorough than retained counsel,[15] Congress concluded that reasonable compensation would improve the quality of the representation of indigents.   Although it might well have been suggested that a statutory immunity would be helpful in inducing counsel to accept representation of indigent defendants, there is nothing in the statute itself or in its legislative history to indicate that Congress ever considered—much less actually intended to implement—any such suggestion.   Indeed, Congress' attempt to minimize the differences between retained and appointed counsel[16] is

---

[14] As amended in 1970, the rates of compensation are $30 per hour for time expended in court and $20 per hour for time reasonably expended out of court (or the minimum hourly rate established by a bar association in the district, whichever is lower), plus reimbursement for expenses reasonably incurred.   The maximum compensation may not exceed $1,000 for an attorney in a felony case or $400 where only misdemeanors are charged. 18 U. S. C. §§ 3006A (d) (1), (2).

[15] See H. R. Rep. No. 864, 88th Cong., 1st Sess., 6 (1963); S. Rep. No. 346, 88th Cong., 1st Sess., 2 (1963); 110 Cong. Rec. 454 (1964) (remarks of Rep. Fraser); Hearings on S. 63 et al. before the Senate Judiciary Committee, 88th Cong., 1st Sess., 249 (1963).

[16] Congress clearly wanted appointed counsel to share as much of retained counsel's characteristic independence from the Government as was possible notwithstanding the Government subsidy.   This is borne out by the debate over whether to include the establishment of full-time public defender offices in the original bill.   The Senate version provided for public defenders.   The House bill did not, at least partly out of fear that full-time public defenders would be too closely identified with the Government's efforts to separate the guilty from the innocent, and that there would be a risk of institutional reluctance adequately to defend the guilty.   See 110 Cong. Rec. 18558 (1964) (remarks of Rep. Moore, author of the bill):

"The Senate bill, in addition to authorizing the appointment of private

more consistent with the view that Congress intended all defense counsel to satisfy the same standards of professional responsibility and to be subject to the same controls.[17]

counsel, would have empowered the Federal Government to establish Federal public defender offices in any or all of the judicial districts throughout the country. This would have had the effect of placing the administration of justice totally in the hands of the Federal Government. An individual, accused of a crime, would have been tried before a Federal judge, prosecuted by a Federal district attorney, and defended by a Federal public defender. Thus, the total right to a fair trial and to the preservation of one's right to liberty would be solely dependent upon men appointed by the Federal Government and compensated out of the Federal Treasury.

"This condition could easily have led to the establishment of totalitarian justice with the well-known unfairness and inequities found in totalitarian states. In addition, this condition could have severely undermined the duties and responsibilities of members of the bar who I believe are under an obligation to defend individuals, even those without funds and even [those] charged in an unpopular cause. The burdens of preserving a healthy society have been gradually eroded in recent years through too great a dependence upon the Federal Government. It did not seem desirable to a majority of the Members of the House to further this erosion. The House bill, then, adopted a philosophy totally different from that reported in the Senate."

See also *id.*, at 445 (remarks of Rep. Moore); *id.*, at 455 (remarks of Rep. McCulloch); Hearings on H. R. 1027 et al. before Subcommittee No. 5 of the House Judiciary Committee, 88th Cong., 1st Sess., 110 (1963).

The House view prevailed at the conference, and the 1964 version of the Act contained no provision for public defenders. In 1970, after a study of the need for public defenders, particularly in the larger districts, Congress amended the Criminal Justice Act to permit the establishment of public defenders to supplement individual appointments of defense counsel. We have found nothing in the legislative history of the 1970 amendments that indicates Congress intended public defenders to be immune from malpractice actions.

[17] As The Chief Justice noted several years ago, "defense counsel who is appointed by the court . . . has exactly the same duties and burdens and responsibilities as the highly paid, paid-in-advance criminal defense lawyer." Burger, Counsel for the Prosecution and Defense—Their Roles

The fact that federal funds provided the source of respondent's compensation is not a sufficient basis for inferring that Congress intended to grant him immunity from malpractice suits. Countless private citizens are the recipients of federal funds of one kind or another, but Congress surely did not intend that all such recipients would be immune for actions taken in the course of expending those funds.

In sum, we find nothing in the express language, the history, or the basic purpose of the Criminal Justice Act of 1964 to support the conclusion that Pennsylvania must accept respondent's claim of immunity from liability for a state tort.

---

Under the Minimum Standards, 8 Am. Crim. L. Q. 2, 6 (1969). See also ABA Project on Standards for Criminal Justice, Defense Function § 3.9 (App. Draft 1971).

Respondent argues that there are valid policy reasons that justify an immunity for appointed counsel not accorded privately retained counsel. The claim is that a defendant's relationship with appointed counsel is substantially different than it would be with retained counsel because of the inability to choose and freely to discharge counsel. See, e. g., Criminal Justice Act Plan for the Western District of Pennsylvania § IV A (3). The defendant would therefore tend to perceive appointed counsel as a representative of the government and to view him with suspicion. After conviction, a defendant's inevitable bitterness would lead to a high risk of retaliatory lawsuits, the same fear that underlies immunity for judges and prosecutors. *Butz* v. *Economou*, 438 U. S. 478, 510. Further, because of the increased risk of malpractice actions, appointed counsel would be more susceptible to pressure from clients to call additional witnesses or to make additional arguments that would in fact prejudice the defendant's own case. But respondent has not directed our attention to any empirical data—in judicial decisions, legislative hearings, or scholarly studies—to support his conclusions that the risk of malpractice litigation deters members of the private bar from accepting the representation of indigent defendants or adversely affects the quality of representation. Given the speculative, though not implausible, nature of respondent's arguments, we are unwilling to ascribe to Congress an intent to accord an immunity to appointed counsel not given retained counsel in the face of the silent legislative history on this point.

## II

Without relying on an explicit statutory grant of immunity, this Court has held that various federal officers, such as a captain in the United States Navy and the Postmaster General,[18] are entitled to immunity from liability for certain claims arising out of the performance of their official duties. The immunity recognized in those cases may be appropriately characterized as an incident of the federal office.

In a sense, a lawyer who is appointed to represent an indigent defendant in a federal judicial proceeding is also a federal officer. Since other federal officers—the judge, the prosecutor, and the grand jurors—enjoy immunity by virtue of their office, arguably that immunity should be shared by appointed counsel. There is, however, a marked difference between the nature of counsel's responsibilities and those of other officers of the court.[19] As public servants, the prose-

---

[18] *Howard* v. *Lyons,* 360 U. S. 593; *Spalding* v. *Vilas,* 161 U. S. 483; *Kendall* v. *Stokes,* 3 How. 87.

[19] Writing for the Court in *In re Griffiths,* 413 U. S. 717, 728–729, MR. JUSTICE POWELL responded to the argument that a lawyer is comparable to other holders of governmental office as follows:

"We note at the outset that this argument goes beyond the opinion of the Connecticut Supreme Court, which recognized that a lawyer is not an officer in the ordinary sense. 162 Conn. [249,] 254, 294 A. 2d [281,] 283 [(1972)]. This comports with the view of the Court expressed by Mr. Justice Black in *Cammer* v. *United States,* 350 U. S. 399 (1956):

" 'It has been stated many times that lawyers are "officers of the court." One of the most frequently repeated statements to this effect appears in *Ex parte Garland,* 4 Wall. 333, 378. The Court pointed out there, however, that an attorney was not an "officer" within the ordinary meaning of that term. Certainly nothing that was said in *Ex parte Garland* or in any other case decided by this Court places attorneys in the same category as marshals, bailiffs, court clerks or judges. Unlike these officials a lawyer is engaged in a private profession, important though it be to our system of justice. In general he makes his own decisions, follows his own best judgment, collects his own fees and runs his own business. The word "officer" as it has always been applied to lawyers conveys quite a different meaning from the word "officer" as applied to people serving as officers

cutor and the judge represent the interest of society as a whole. The conduct of their official duties may adversely affect a wide variety of different individuals, each of whom may be a potential source of future controversy. The societal interest in providing such public officials with the maximum ability to deal fearlessly and impartially with the public at large has long been recognized as an acceptable justification for official immunity.[20] The point of immunity for such

---

within the conventional meaning of that term.' *Id.*, at 405 (footnote omitted)."

[20] As Mr. Justice Harlan wrote in his opinion in *Barr* v. *Matteo*, 360 U. S. 564, 571–572:

"The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government. The matter has been admirably expressed by Judge Learned Hand:

" 'It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end

officials is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion.

In contrast, the primary office performed by appointed counsel parallels the office of privately retained counsel. Although it is true that appointed counsel serves pursuant to statutory authorization and in furtherance of the federal interest in insuring effective representation of criminal defendants, his duty is not to the public at large, except in that general way. His principal responsibility is to serve the undivided interests of his client. Indeed, an indispensable element of the effective performance of his responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation. The fear that an unsuccessful defense of a criminal charge will lead to a malpractice claim does not conflict with performance of that function. If anything, it provides the same incentive for appointed and retained counsel to perform that function competently.[21] The primary rationale for granting immunity to judges, prosecutors, and other public officers does not apply to defense counsel sued for malpractice by his own client.[22]

It may well be true, as respondent argues, that valid policy reasons might justify an immunity for appointed counsel that need not be accorded to privately retained counsel. See n. 17, *supra*. Perhaps the most persuasive reason for creating such an immunity would be to make sure that competent

---

better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. . . .' *Gregoire* v. *Biddle,* 177 F. 2d 579, 581."

[21] There is no claim that retained counsel are rendered immune from malpractice actions by virtue of their participation in federal criminal trials.

[22] Our discussion is confined to immunity in malpractice actions. We do not address the question whether defense counsel is immune from other kinds of tort suits such as a defamation action brought by someone other than his client. Cf. *Butz* v. *Economou,* 438 U. S., at 512 (dictum).

counsel remain willing to accept the work of representing indigent defendants. If their monetary compensation is significantly less than that of retained counsel, and if the burden of defending groundless malpractice claims and charges of unprofessional conduct is disproportionately significant, it is conceivable that an immunity would be justified by the need to preserve the supply of lawyers available for this important work. Whether a sufficient need can be demonstrated that would justify such a rule, or whether such a problem might be better remedied by adjusting the level of compensation, are questions that can most appropriately be answered by a legislative body acting on the basis of empirical data. Therefore we do not evaluate those arguments. Having concluded that the essential office of appointed defense counsel is akin to that of private counsel and unlike that of a prosecutor, judge, or naval captain, we also conclude that the federal officer immunity doctrine explicated in cases like *Howard* v. *Lyons*, 360 U. S. 593, and *Butz* v. *Economou*, 438 U. S. 478, is simply inapplicable in this case. Accordingly, without reaching any question concerning the power of Congress to create immunity, we hold that federal law does not now provide immunity for court-appointed counsel in a state malpractice suit brought by his former client.

The judgment of the Supreme Court of Pennsylvania is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*