Arthur H. RUSSELL, Plaintiff–Appellee,

v.

Bill HARDIN, et al.,

and

Major McPherson, et al.,
Defendants–Appellants.

Nos. 88–1805WA, 88–1806WA.

United States Court of Appeals,
Eighth Circuit.

Submitted March 15, 1989.

Decided July 18, 1989.

Jeffrica Jenkins Lee, Washington, D.C. and Gordon Webb, Harrison, Ark., for defendants-appellants.

L.T. Bradt, Houston, Tex., for plaintiff-appellee.

Before FAGG and BEAM, Circuit Judges, and DUMBAULD *, Senior District Judge.

* The Honorable Edward Dumbauld, Senior District Judge for the Western District of Pennsylvania, sitting by designation.

DUMBAULD, Senior District Judge.

This case presents an interesting question as to the scope of protection accorded to police and other law enforcement officers by the doctrine of qualified immunity. The District Court denied appellant's motion for summary judgment on the ground that there was a disputed issue of material fact with respect to the officers' subjective intent in executing a valid search warrant. Since that conclusion conflicts with the strong policy of the Supreme Court in favor of prompt determination of insubstantial and vexatious lawsuits against public officials *in limine* without the burden and expense of trial, we reverse.

## I

### The Facts

Appellants had probable cause to search the house of appellee, Arthur H. Russell, for evidence of his having there harbored a fleeing federal felon.[1] As they suspected him of connection with an armed gang (known as "The Covenant, the Sword, and the Army of Lord") which had a military-type compound nearby and might interfere with the search, a strong force including a SWAT team with aerial surveillance, and an Arkansas deputy sheriff (appellant McPherson)[2], was assembled to execute the warrant. Entrance was effected by dislodging a second story lock. Agent Buford of the Bureau of Alcohol, Tobacco, and Firearms simply searched the house for explosives and, after determining that there was no danger, departed. Judgment in his favor was granted by the District Court, for the reason that he had not participated in the allegedly unlawful seizure or removal of property from the house.[3]

Special Agent Kent of the Little Rock SWAT team, while searching an upstairs bedroom, discovered an unlocked ammunition box containing a large quantity of silver.[4]

Special Agent Joe Hardage had in preparation for the raid contacted an IRS agent for information about appellee's lifestyle and possible propensity for violence. Hardage learned that appellee owed a large tax obligation and that the IRS had placed a lien on his assets. But no request was made that search for any assets in the house be made during execution of the warrant. When the silver was found, Hardage inquired whether the IRS had any interest in the silver, but was advised that review of the file would be necessary before any answer could be given. Hardage then consulted the United States Attorney as to what should be done with the silver.[5]

Since the door had been damaged when the lock was dislodged, and news media on the scene were aware of the situation, Hardage and his colleague Kelley decided that to avoid possibility of theft and exposure of the search team to liability, it would be prudent to remove the silver from the house for safekeeping.[6] This action was appropriate in accordance with *U.S. v. Lacey*, 530 F.2d 821, 823 (8th Cir. 1976), *cert. denied*, 429 U.S. 845, 97 S.Ct. 125, 50 L.Ed.2d 115 (1976).

---

1. Russell was subsequently convicted of that offence. He was incarcerated upon that charge at the time of the search. He did not contest the validity of the search warrant, but complained of *ultra vires* seizure of property not specified in the warrant. App. 90.

2. The claim against the deputy sheriff is based upon 42 U.S.C. § 1983. The federal defendants are sued directly for alleged tortious violation of the Constitution pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 389, 395, 91 S.Ct. 1999, 2001, 2004, 29 L.Ed.2d 619 (1971).

3. For the same reason agents Kent and Knox were dismissed, as well as United States Attorney Hutchinson, who was consulted by telephone by agent Hardage during the raid.

4. He did not then count or inventory the silver, but witnessed and signed the inventory of the silver after other agents had made the decision to remove it from the house. App. 27. Deputy Sheriff McPherson likewise signed the inventory as witness, but also helped the agents carry silver to Agent Kelley's car. App. 104. This manual and ministerial act was apparently regarded by the District Judge as sufficient participation in the seizure or removal of the silver to defeat McPherson's motion for summary judgment. App. 63, 65.

5. See note 3, *supra.*

6. App. 86, 105.

On the next day the IRS issued a levy upon the silver, and Hardage relinquished it. Apparently appellee decided to pay the IRS claim of $42,004.09, estimating that the silver was worth over $76,000.00. His lawyer's sister arrived from Texas with a check for the amount of the lien, and took the silver to Houston as collateral.[7] Apparently the silver was sold, and the surplus over the debt went to appellee's lawyer for fees.[8]

## II

### The Law of Qualified Immunity

■ The essence and nature of an official immunity defense, like a plea of double jeopardy,[9] or certain other separable issues,[10] is that it is not designed merely to assure the appropriate outcome of litigation, but to relieve the defendant from undergoing the burdens and expense of litigation at all.[11] This is most plainly seen in the case of absolute immunity, now confined to judicial and prosecutorial officers.[12] The "bright line" test applied there affords protection even if actual malice exists.[13] Qualified immunity however, by definition, presents a situation where an executive official "may or may not be subject to liability depending on all the circumstances that may be revealed by evidence."[14] This is an invitation to require production of evidence at trial, as the courts generally did before the law of qualified immunity was reformulated in *Har-low v. Fitzgerald*, 457 U.S. 800, 816, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982).[15]

The *locus classicus* setting forth the policy justification for official immunity is Judge Learned Hand's often-cited exposition:

It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the an-

---

7. App. 86–89, 94, 97.

8. App. 100. According to the Brief of the Federal Appellants, p. 5, after the IRS levy, "Plaintiff subsequently paid his outstanding tax obligation and the silver was returned to him."

9. *Abney v. U.S.*, 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977).

10. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949).

11. *Mitchell v. Forsyth*, 472 U.S. 511, 525–29, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985).

12. *Ferri v. Ackerman*, 444 U.S. 193, 202–204, 100 S.Ct. 402, 408–409, 62 L.Ed.2d 355 (1979) [holding public defender not entitled to immunity]. See also Justice Rehnquist's comment in *Butz*, 438 U.S. at 528 n., 98 S.Ct. at 2921 n.

13. *Barr v. Matteo*, 360 U.S. 564, 569–74, 79 S.Ct. 1335, 1338–41, 3 L.Ed.2d 1434 (1959). Proof of malice is required to sustain a libel suit by a "public figure." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The complications involved in this process were well illustrated in the much publicized but inconclusive litigation by General Westmoreland against CBS.

14. Burger, C.J. in *Scheuer v. Rhodes*, 416 U.S. 232, 239, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974).

15. See text at notes 20–23 *infra*.

swer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as res nova, we should not hesitate to follow the path laid down in the books.[16]

The Supreme Court, in *Scheuer v. Rhodes*, 416 U.S. 232, 239–48, 94 S.Ct. 1683, 1688–92, 40 L.Ed.2d 90 (1974), *Butz v. Economou*, 438 U.S. 478, 504–08, 98 S.Ct. 2894, 2909–10, 57 L.Ed.2d 895 (1978), *Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982), and *Mitchell v. Forsyth*, 472 U.S. 511, 520–21, 105 S.Ct. 2806, 2812–13, 86 L.Ed.2d 411 (1985), held that for the executive branch, even officials of Cabinet rank except in special circumstances,[17] "qualified immunity" is the norm [18] as it suffices to protect

"all but the plainly incompetent or those who knowingly violate the law." [19] But qualified or good faith immunity involved a "subjective element" of intention or malice which often was considered by courts as involving questions of fact which inherently required resolution by a jury.[20] However, the prolonged judicial proceedings incident to inquiry regarding subjective motivation are incompatible with the Supreme Court's strong and repeatedly [21] stated policy that insubstantial and vexatious claims against public officials should be disposed of *in limine* without trial.[22]

Accordingly, in *Harlow* the Court "completely reformulated qualified immunity ... replacing the inquiry into subjective malice ... with an objective inquiry into the legal reasonableness of the official action." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3041–42, 97 L.Ed.2d 523 (1987).[23]

**16.** *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). For quotations of and references to Judge Hand's opinion see *e.g. Arcoren v. Peters*, 811 F.2d 392–95 (8th Cir. 1987), en banc on other grounds, 829 F.2d 671 (8th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988). *Barr v. Matteo*, 360 U.S. 564, 571–72, 79 S.Ct. 1335, 1339–40, 3 L.Ed.2d 1434 (1959); *Butz v. Economou*, 438 U.S. 478, 521–22, 98 S.Ct. 2894, 2918–19, 57 L.Ed.2d 895 (1978); *Ferri v. Ackerman*, 444 U.S. 193, 203–04, 100 S.Ct. 402, 408–09, 62 L.Ed.2d 355 (1979).

**17.** *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 102 S.Ct. 2690, 2700, 73 L.Ed.2d 349 (1982).

**18.** *Malley v. Briggs*, 475 U.S. 335, 340, 343, 106 S.Ct. 1092, 1095, 1097, 89 L.Ed.2d 271 (1986); *Harlow*, 457 U.S. at 807, 102 S.Ct. at 2732.

**19.** 475 U.S. at 341, 106 S.Ct. at 1096.

**20.** 457 U.S. at 816, 102 S.Ct. at 2737. As Justice Brandeis sagely observed in *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51–52, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938):

Lawsuits ... often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact.

**21.** *Butz v. Economou*, 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800, 813–16, 102 S.Ct. 2727, 2735–37, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 3042, 97 L.Ed.2d 523 (1987).

**22.** This optimistic expectation was part of the tradeoff in the balance of interests which accorded qualified rather than absolute immunity to executive officials. 457 U.S. at 814–15, 102 S.Ct. at 2736–37. As then Chief Justice Burger pointed out in *Harlow*, "many utterly frivolous and even bizarre" cases were being filed against public officials. 457 U.S. at 827, 102 S.Ct. at 2743. Besides clogging the courts such litigation diverted officials from the efficient performance of their public duties. In *Butz*, Justice Rehnquist voiced doubts as to the workability of the qualified immunity scheme. 438 U.S. at 526–30, 98 S.Ct. at 2920–22. See note 20, *supra*.

**23.** The *Anderson* case arose in the Eighth Circuit, and in *Kennedy v. LeFebvre*, 847 F.2d 482, 484 (8th Cir.1988), we found it unnecessary to decide whether it changed the standard of *Harlow v. Fitzgerald*. The dissenting opinion of Justice Stevens succinctly states the proposition decided in *Anderson*: "whether *Harlow v. Fitzgerald* requires immunity for a federal law enforcement agent who advances the fact-specific claim that a reasonable person in his position could have believed that his particular conduct would not violate rights that he concedes are clearly established." 107 S.Ct. 3043. Speaking for the minority, Justice Stevens answered that question in the negative, but the majority answered it in the affirmative, thus amplifying but reaffirming *Harlow*. The dissent would have limited *Harlow* to high level executive officers rather than extending it to officers performing police functions.

The seeming self-contradiction or logomachy of holding that an officer may reasonably make

The *Harlow* test "focuses on the objective legal reasonableness of an official's acts." 457 U.S. at 819, 102 S.Ct. at 2738. The wisdom of such a rule is amply justified on grounds of policy.

As set forth in the *Harlow* opinion:

Consistently with the balance at which we aimed in *Butz,* we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery ...

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many unsubstantial claims on summary judgment. [457 U.S. at 817–18, 102 S.Ct. at 2738]

As stated in *Anderson,* the officer's "subjective beliefs about the search are irrelevant." [107 S.Ct. at 3040] Hence, as clearly stated by Justice White in *Mitchell:*

*Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is [like absolute immunity] an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.[24]

■ Perhaps the present Chief Justice was correct in his skepticism regarding the workability of the Supreme Court's qualified immunity rule established in *Harlow.* There may be no satisfactory middle course between the untrammeled evidentiary hearing which the District Judge's decision here would involve, and the course we choose

which may perhaps be regarded as arbitrary screening.[25] Yet we believe that under the specific facts and circumstances of the case at bar the conclusion which we reach is more faithful to the twofold policy and purpose of *Harlow.* We hold, accordingly, that as a matter of law appellants here are entitled to qualified immunity even if their course of conduct involved benevolent cooperation with the IRS. Their search was proper, and also their safekeeping of the silver. Likewise the levy by the IRS was lawful and valid. Even if appellants "tipped off" the IRS regarding the existence and location of the silver, they committed no impropriety. This action would no more destroy appellants' qualified immunity than if a silversmith, with whom appellee had left his silver to be fashioned into jewelry, had informed the IRS where the silver was to be found.

The appellants in the case at bar acted in the performance of their normal functions and duties. They committed no improprieties in the execution of the search warrant, or in the safekeeping of the incidentally discovered silver for the prevention of theft and to shield the search team against potential liability claims. This is true, notwithstanding the fact that one of the team knew that appellee owed taxes and that the IRS had issued a lien upon his property. This knowledge had not been communicated to the other agents, nor had the IRS at the time of seizure expressed any knowledge of the silver or any desire that the search team look for it or seize it. Later a perfectly valid levy was made upon the silver by the IRS, and it was utilized to extinguish appellee's debt.

Therefore there was no "unreasonable" seizure or retention of the silver by appellants in violation of the Fourth Amendment. Hence there was no Bivens-type

---

an unreasonable seizure (*ibid.,* 107 S.Ct. at 3041) is answered by Justice Scalia's formulation in which the word "reasonable" is not used twice (the officer may "reasonably but mistakenly conclude that probable cause is present"). *Ibid.,* 107 S.Ct. at 3039. The majority opinion warns against reintroducing into qualified immunity analysis the inquiry into officials' subjective intent that *Harlow* sought to eliminate. *Ibid.,* 107

S.Ct. at 3040. It was in failing to heed that warning that the District Court went astray.

**24.** 472 U.S. at 526, 105 S.Ct. at 2815 [italics in original, see 472 U.S. at 552, 105 S.Ct. at 2829].

**25.** 438 U.S. at 530, 98 S.Ct. at 2922. See note 22 *supra.*

action available against the federal defendants, nor Section 1983 action against the Arkansas deputy sheriff. Their motions for summary judgment should have been granted, and the contrary judgment of the District Court is accordingly

REVERSED.