Cite as 2020 Ark. 418

# SUPREME COURT OF ARKANSAS
No. CR-19-926

|  |  |
|---|---|
| | **Opinion Delivered:** December 17, 2020 |
| MARVIN ARRELL STANTON<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | APPEAL FROM THE MILLER COUNTY CIRCUIT COURT [NO. 46CR-15-503]<br><br>HONORABLE KIRK JOHNSON, JUDGE<br><br>REVERSED AND REMANDED. |

**SHAWN A. WOMACK, Associate Justice**

Marvin Stanton was convicted of first degree murder and sentenced to life in prison. This was his third trial for the murder of Jesse Hamilton. The first conviction was reversed on direct appeal, then a mistrial occurred on remand. Because of the prosecutor's improper campaigning in the courthouse during trial, Stanton's conviction must once again be reversed, and this case will return to Miller County for a fourth trial.

## I.

## A.

On a September evening in 2015, Stanton pulled his motorcycle into a Texarkana gas station with three other friends. His friends parked their motorcycles in open parking spots, but Stanton stopped at the gas pump. His preferred parking spot was occupied by Jesse Hamilton's truck. Hamilton was with his friends, Lavon Strong and SanMarcus Jacobs. The

three men were about to leave the station when Stanton yelled at Hamilton to "move [his] fucking truck." As Stanton approached, Hamilton and his friends stepped outside the truck and an argument ensued. While arguing with Hamilton, Stanton flashed his .45 caliber pistol. Though he was unarmed, Hamilton responded that he was unafraid of a gun.

The argument became physical after Stanton shoved Hamilton against the truck. The two men scuffled on the ground for twenty-five seconds before Hamilton got the better of Stanton. They stood up and separated several feet from each other. But Stanton was not done. He pulled his gun and trailed the red laser sight down Hamilton's body until it reached his abdomen. Stanton pulled the trigger. A hollow point round penetrated Hamilton's abdomen, damaging his aorta and intestines, and exited through his back. He was transported to a local hospital, where doctors attempted life-saving surgery. Their efforts proved unsuccessful and Hamilton died four hours later.

B.

Stanton has stood trial three times for Hamilton's death. His first trial resulted in a conviction of first degree murder and employing a firearm to commit the murder. We reversed on direct appeal due to improper admission of character evidence. *See Stanton v. State*, 2017 Ark. 155, 517 S.W.3d 412. Stanton's second trial ended in mistrial during the guilt phase. This appeal centers on the third trial.

Prosecutor Stephanie Barrett prosecuted the case. At the time of the third trial, Barrett was campaigning for a position in the Arkansas Court of Appeals and seeking

signatures for placement on the ballot.[1] On the first day of trial, a family member of Barrett's campaigned and solicited signatures on Barrett's behalf in the courthouse. Prospective jurors were asked to sign election petitions for Barrett and other judicial candidates as they walked through the courthouse. Campaign materials featuring Barrett's photograph and her asserted credentials were placed on the bailiff's security station throughout the first day and a half of trial. The venire pool and members of the public mandatorily encountered this table each time they entered the courtroom and went through security.

Defense counsel learned about the campaigning after the first day of trial. When he raised the issue the following morning, the deputy prosecutor claimed that a sitting circuit court judge suggested that Barrett solicit signatures from jury pools entering the courthouse and personally engaged in that practice. Barrett was instructed to hand over the signed petition sheets. She obtained the sheets at lunch, discovered that a seated juror had signed the petition, yet said nothing until after the evening recess. Of the nine signatures collected, four belonged to prospective jurors, including one juror who was ultimately selected.

The next morning, Stanton moved for mistrial based on an appearance of impropriety. The circuit court questioned each juror about the campaigning and its impact on their impartiality. Most jurors were asked to sign petitions, and some had signed petitions for various judicial candidates. The juror who signed Barrett's petition could not recall whose petition she signed. Each juror assured the court that they could remain fair and impartial.

---

[1]Barrett was elected to the court of appeals this year.

Satisfied with their answers, the circuit court refused to grant mistrial. Stanton then sought to remove the juror who signed Barrett's petition. That too was denied.

The trial concluded later that day. The jury rejected Stanton's justification defense and convicted him of first degree murder. He was sentenced to life in prison plus fifteen years for a firearm enhancement. Following the conviction, Stanton moved for a new trial and sought to recuse all judges in the Eighth Judicial District South from the case. The circuit court refused to conduct a hearing and denied the motions in an untimely written order. This appeal followed.

## II.

Stanton raises four challenges to his conviction. He first appeals the circuit court's decisions related to the prosecutor's campaigning and solicitation of signatures at the courthouse. This issue merits reversal and we remand for a new trial. Stanton also challenges the circuit court's refusal to provide two jury instructions, the exclusion of evidence regarding Hamilton's intoxication, and limitations imposed on the cross-examination of a witness. When one point warrants reversal, we generally decline to consider the remaining points on appeal. *See Burton v. State*, 367 Ark. 109, 115, 238 S.W.3d 111, 116 (2006). But given that the issue regarding evidence of Hamilton's intoxication may arise again on remand, we will address that point at this time.

## III.

The primary issue in this case involves Prosecutor Stephanie Barrett's campaigning in the courthouse during Stanton's murder trial. This issue is a novel one, but we believe it is

4

easily resolved by long-standing principles involving the administration of justice. Prosecutors are "representative[s] not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). As such, prosecutors have a solemn obligation to protect the integrity of the court and the criminal justice system. *See Ferri v. Ackerman*, 444 U.S. 193, 202–03 (1979) ("the prosecutor and the judge represent the interest of society as a whole"); *see also* Ark. R. Prof. Conduct 3.8, cmt. 1 (prosecutor is "minister of justice"). When a prosecutor or judge fails in these duties, the integrity of the entire criminal justice system may be impugned.

Stanton contends that Barrett's courthouse campaigning to jurors and potential jurors created an appearance of impropriety that fatally undermined the integrity of his trial. This argument embraces four subpoints challenging four of the circuit court's decisions: (1) the denial of mistrial; (2) the refusal to remove the juror who signed Barrett's petition; (3) the refusal to recuse; and (4) the refusal to conduct a hearing on the motion for new trial and delayed entry of an order denying the motion. We conclude that a mistrial was required and reverse on the first subpoint. The remaining subpoints do not warrant further discussion.

A.

Our general standard for mistrial is well established. A mistrial is an extreme and drastic remedy appropriate only when there has been an error so prejudicial that justice

5

cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *See McClinton v. State*, 2015 Ark. 245, at 2–3, 464 S.W.3d 913, 914. The circuit court's decision will not be reversed absent an abuse of discretion or manifest prejudice to the moving party. *Id.*

In determining whether the prosecutor's actions rose to the level of mistrial, Stanton urges application of an "appearance of impropriety" standard. He relies on *Elmore v. State*, 355 Ark. 620, 623, 144 S.W.3d 278, 280 (2004), where we concluded that the judge's refusal to remove his spouse from the jury created an appearance of impropriety warranting reversal of the conviction. The State, on the other hand, contends this issue should be reviewed under the standard for removing a juror. That standard requires Stanton to prove both bias and prejudice resulting from the alleged juror misconduct. *See Butler v. State*, 349 Ark. 252, 261, 82 S.W.3d 152, 157 (2002). The State also points to a court of appeals' decision requiring a showing of prejudice and an abuse of discretion when reviewing the denial of mistrial based on the impact of spectators' badges featuring a picture of the victim. *See Kenyon v. State*, 58 Ark. App. 24, 946 S.W.2d 705 (1997).

We believe the State misses the mark. This case has nothing to do with juror misconduct or the impact of actions taken by members of the public. To the contrary, this case centers solely on the actions of the prosecutor and the circuit court's implicit approval of such actions. Though *Elmore* involves only judicial conduct, we agree with Stanton that the "appearance of impropriety" standard applies here. Like judges, attorneys "must strive to avoid not only professional impropriety, but also the appearance of impropriety. The duty

6

to avoid the appearance of impropriety . . . is part of the foundation upon which are built the rules that guide lawyers in their moral and ethical conduct." Ark. R. Prof. Conduct pmbl., cmt. 13A. Disturbingly, solicitation of signatures from prospective jurors for political purposes is apparently a common practice for some sitting judges. Our concerns with Barrett's conduct apply with equal force to the same conduct taken by sitting judges.

Claims of an "appearance of impropriety" are assessed under an objective standard and turn on the perception of a reasonable person. *See Huffman v. Ark. Judicial Discipline and Disability Comm'n*, 344 Ark. 274, 285, 42 S.W.3d 386, 394 (2001); *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 886 (2009). We agree with Stanton that this objective standard is "designed to promote the public's confidence in the impartiality and integrity of the judicial process." *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013) (internal quotation omitted). In short, a mistrial is warranted here only if an appearance of impropriety occurs that is so prejudicial that justice cannot be served by continuing the trial or that manifestly affects the fundamental fairness of the trial.

B.

That Barrett campaigned and solicited signatures from jurors and prospective jurors during the first day and a half of trial is beyond dispute. The State acknowledges this conduct but does not concede that it was inappropriate, much less that it resulted in an appearance of impropriety. We hold that Barrett's actions were, at minimum, inappropriate and gave rise to an appearance of impropriety. Her actions were also per se improper in the context of the fair and impartial administration of justice.

7

The prospective jurors entered the courthouse on the first day of Stanton's trial under the court's command. *See* Ark. Code Ann. § 16-32-106(d) (Supp. 2007). Failure to comply with this obligation could result in a monetary fine and criminal contempt. *Id.* When entering the courthouse, the prospective jurors became a captive audience bombarded with election petitions from Barrett and at least two other sitting circuit judges.[2] This is an abuse and exploitation of the judicial system and the fundamental civic responsibility of jury service.

This abuse was furthered by the presence of Barrett's campaign materials on the bailiff's security table. As prospective jurors and members of the public went through security to enter the courtroom, they encountered campaign materials featuring Barrett's photograph and a list of her asserted credentials. We agree with Stanton that the presence of Barrett's campaign materials on the bailiff's security table created an apparent endorsement by the circuit court. The bailiff is a member of the court's security staff and is subject to the court's control. Indeed, due to the close relationship between the bailiff and the court, any action by the bailiff concerning the jury should be closely scrutinized. *See Lewis v. Pearson*, 262 Ark. 350, 354, 556 S.W.2d 661, 664 (1977).

---

[2]According to Barrett, one sitting circuit judge gathered forty signatures from Stanton's jury pool during the first day of trial. Though the judges soliciting signatures did not preside over this case, the solicitation was still improper. Moreover, it runs the risk of confusing jurors and tainting trials that the judge is not involved in. Indeed, one of the selected jurors in this case believed she signed a petition for the presiding judge even though he was not running for re-election.

Once the prospective jurors entered the courtroom, they were faced with deciding Stanton's fate. As prosecutor, Barrett argued for Stanton's conviction and lifetime incarceration. Barrett's campaigning for a judicial position and solicitation of signatures from the prospective jurors during trial created the appearance of attempting to boost her credibility with the jury. Such conduct is incompatible with the prosecutor's role in our judicial system, which is not to convict or win a case, but to secure justice. *See Berger*, 295 U.S. at 88.

This kind of conduct has no place in the administration of justice and should not have been permitted. The circuit court should have dealt promptly with the prosecutor's improper campaigning in the courthouse during trial. A mistrial should have immediately been granted once it was discovered that Barrett was soliciting signatures and support for her judicial campaign from jurors and potential jurors as they entered the courthouse for the trial she was prosecuting. However, the circuit court not only declined to grant a mistrial, it refused to remove the juror whose signature appeared on Barrett's petition. We find this decision particularly perplexing given that there were alternate jurors who could have readily filled the vacancy. That said, substitution of the juror would have been insufficient to remedy the appearance of impropriety resulting from Barrett's inappropriate campaigning.

In reaching our decision, we reject the State's characterization of this case as merely involving whether a juror votes for a prosecutor or judge. Prosecutors and judges are elected officials in Arkansas and the jury pool consists of registered voters. It is thus inevitable that jurors will determine cases involving these elected officials. However, unlike the legitimate

political function of candidates and voters voluntarily interacting in appropriate settings, the case at bar involves improper conduct by officials in positions of authority toward citizens whose attendance and participation are compelled by law and over whom the officials may exercise undue influence in a manner inconsistent with the constitutionally protected right to a fair trial. Contrary to the State's assertion, our decision does not hold that potential voters should be excluded based on whether they voted for a specific prosecutor or judge. Moreover, we do not hold that a juror's mere knowledge that the prosecutor was seeking a judicial position is prejudicial. *See, e.g., California v. Cook*, 157 P.3d 950, 968 (Cal. 2007).

Having found Barrett's campaigning per se improper in the context of the fair and proper administration of justice, we must decide whether it constitutes grounds for reversal. Despite the circuit court's voir dire, we find that Barrett's actions fatally undermined a fundamental aspect of our criminal justice system and is thus reversible. "An error is fundamental if it undermines confidence in the integrity of the criminal proceeding." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987). We can only conclude that Stanton had valid reason to believe that his case was being tried before a jury who had been conditioned to give credibility to the prosecutor's argument. Further, in the eyes of the public, the impartiality of justice was shattered. As a result, there is no need to show actual prejudice. Because the appearance of impropriety resulting from the prosecutor's conduct eroded the very core of our criminal justice system's integrity, reversal is required without regard to harmlessness.

10

We are further troubled by the impact such conduct could have on other individuals entering the courthouse for a trial or hearing. When solicited for signatures by or on behalf of the prosecutor or presiding judge during or immediately before trial, a defendant, their family, or other parties before the court may reasonably question whether their willingness or refusal to sign the petition could impact the outcome of their case. This may cause irretrievable damage to the public's perception of justice and cannot be allowed.

IV.

We now consider whether the circuit court improperly excluded evidence of Hamilton's intoxication. The autopsy revealed that Hamilton was intoxicated at the time of death.[3] Stanton argued the evidence was relevant to his justification defense because of the effect intoxication may have had on Hamilton's behavior. Relying on *Cagle v. State*, 68 Ark. App. 248, 6 S.W.3d 801 (1999), the circuit court found that the evidence was not admissible because there was no evidence that Stanton knew Hamilton had been drinking or that Hamilton's behavior supported a reasonable inference of intoxication. On appeal, Stanton argues that *Cagle* should be overruled or distinguished. We disagree.

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ark. R. Evid. 401. Though all relevant evidence is admissible, *see* Ark. R. Evid. 402, it can be excluded if its probative value is outweighed by

---

[3]The report stated that Hamilton's blood alcohol concentration was 0.116. The legal level of intoxication is .08. *See* Ark. Code Ann. § 5-65-103 (Repl. 2016).

the danger of unfair prejudice or confusion of the issues, *see* Ark. R. Evid. 403. The circuit court's evidentiary rulings will not be reversed absent an abuse of discretion and a showing of prejudice. *See Collins v. State*, 2019 Ark. 110, at 5, 571 S.W.3d 469, 471–72.

The court of appeals has held that evidence of a victim's intoxication or drug use at the time of death is generally irrelevant to the defendant's claim of justification. *See Cagle*, 68 Ark. App. at 251–52, 6 S.W.3d at 803. The evidence may only be relevant if the defendant knew the victim was using drugs or alcohol, or if the victim's behavior was such that the defendant could have reasonably inferred that the victim was under the influence. *Id.* Though we have not previously considered this precise issue, we agree with *Cagle*'s analysis and find it applicable to this case.

*Cagle* is consistent with our decisions excluding similar evidence unknown to the defendant at the time of the murder. We previously upheld the exclusion of an autopsy report showing a victim's cocaine use because there was no evidence showing that cocaine was linked to the murder. *See Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). Though *Jones* did not involve a justification defense, we applied similar principles where the defense was raised. *See Halfacre v. State*, 277 Ark. 168, 171–72, 639 S.W.2d 734, 736 (1982). When assessing the reasonableness of the defendant's justification defense, we held that the defendant's knowledge of a victim's violent characteristics or specific prior violent acts was critical because it was relevant to the defendant's state of mind and the reasonableness of his fear of the victim. *Id.* Evidence of the victim's characteristics or specific prior acts unknown to the defendant at the time of the murder were thus irrelevant and inadmissible. *Id.*

12

There is no evidence that Stanton knew of Hamilton's intoxication or that Hamilton behaved in such a way that intoxication could be inferred. Indeed, it appears Stanton only learned of Hamilton's intoxication when he received the autopsy report. Given that Stanton was entirely unaware of Hamilton's intoxication, it would not have had any bearing on his state of mind or belief that self-defense was warranted. Moreover, Stanton was the initial aggressor with respect to both the verbal and physical altercations. Any evidence of Hamilton's intoxication and the general behaviors of an intoxicated person is not relevant and would be unduly prejudicial. Further, Stanton cannot show prejudice. Strong testified that Hamilton had been drinking. The jury was aware of Hamilton's drinking and could factor that information into its consideration of Stanton's guilt and his justification defense.

V.

As required by Rule 4-3(i), we have examined the record for all objections, motions, and requests made by either party that were decided adversely to Stanton. Our review has not revealed any other prejudicial error.

VI.

Because of the per se improper political activity of the prosecutor campaigning for a judicial position in a courthouse full of potential jurors mandated to attend a trial she was prosecuting, and the complete failure of the trial court to resolve the situation below when given the opportunity, the integrity of Stanton's trial and our criminal justice system was compromised. The resulting appearance of impropriety so infected the integrity of the entire

13

proceeding as to warrant a new trial. Stanton's conviction must be reversed, and we remand this case for a fourth trial.

Reversed and remanded.

Special Justice ROBERT S. COLEMAN joins in this opinion.

BAKER and WOOD, JJ., concur.

HART, J., concurs in part and dissents in part.

KEMP, C.J., not participating.

**JOSEPHINE LINKER HART, Justice, concurring in part and dissenting in part.** I concur in the disposition of this case. I write separately because I do not agree with the majority's decision to affirm or not consider several of the briefed points that are likely to arise in Stanton's retrial. Also, there is a significant issue regarding sentencing-phase evidence that should be addressed pursuant to Arkansas Supreme Court Rule 4-3(i).

I. *Refusal to Give Manslaughter Instructions*

In my view, the circuit court abused its discretion in refusing to instruct the jury on both manslaughter formulations. It is reversible error to refuse to give an instruction on a lesser-included offense supported by even the slightest evidence. *See Armstrong v. State*, 2020 Ark. 309, at 9, 607 S.W.3d 491, 498. In *McCoy v. State*, 347 Ark. 913, 69 S.W.3d 430 (2002), this court reiterated what is still regarded as the most settled of black-letter law: "No right has been more zealously protected by this court than the right of an accused to have the jury instructed on lesser-included offenses." The evidentiary requirement for giving an instruction, "the slightest evidence" is perhaps the lowest recognized in the law.

14

Clearly, there was at least the slightest evidence that Stanton committed reckless manslaughter. Reckless manslaughter is committed when a person recklessly or negligently forms the belief that deadly physical force is necessary or if the person employs an excessive degree of physical force. *Harshaw v. State*, 344 Ark. 129, 39 S.W.3d 753 (2001). In *Rainey v. State*, 310 Ark. 419, 837 S.W.2d 453 (1992), this court reversed a first-degree murder conviction because the circuit court refused to give a manslaughter instruction. Significantly, the circuit court in *Rainey* did instruct on second-degree murder. *Id. Rainey* has not been overruled, so it is still good law. It should be followed.

The circuit court also abused its discretion by refusing to instruct the jury on extreme-emotional-disturbance manslaughter. This manslaughter formulation succeeded the archaic "heat of passion" or "voluntary" manslaughter when the current criminal code was adopted. *Johnson v. State*, 2016 Ark. 156, 489 S.W.3d 668. This formulation addressed the situation in which a person committed a homicide when his or her emotions overcame rational thought.

I am mindful that caselaw states that the relevant mens rea for this formulation required that it be "provoked" by physical fighting, a threat, or a brandished weapon. *Bankston v. State*, 361 Ark. 123, 129, 205 S.W.3d 138, 143 (2005); *Kail v. State*, 341 Ark. 89, 94, 14 S.W.3d 878, 880–81 (2000); *Rainey v. State*, 310 Ark. 419, 837 S.W.2d 453 (1992). In context, "provoked" means "caused," as in the extreme emotional disturbance *caused* by physical fighting, a threat, or a brandished weapon.

There is at least the slightest evidence that Stanton's mental state evolved during the

course of the altercation. Obviously, it was not his intention to shoot Jesse Hamilton at the outset; he kept his pistol holstered and revealed that he was armed apparently to prevent escalation of the incident. After being bested in a fight where weapons were not used, he found himself physically outmatched by a younger, fitter man who was backed up by two associates. Disabused of any notion that his physical prowess would carry the day--Stanton was a Marine who had served in Desert Storm--and informed at the outset by Hamilton that Hamilton was not intimidated by firearms, Stanton resorted to deadly force. Was this a situation where Stanton got more than he bargained for? Perhaps. It is also possible that Stanton's use of deadly force was motivated by revenge; he did just receive a sound beating. However, that question belongs to the jury, not the circuit court, or this court playing Monday-morning quarterback. Whether to give the jury instruction should focus on the evidence of Stanton's mens rea when he committed the homicide and nothing else.

## II. *Evidence of Hamilton's Intoxication*

The circuit court erred in excluding the toxicology report from Hamilton's autopsy. In the first place, it is part of the res gestae. It was Stanton's right to have the jury apprised of the true nature of the altercation. Second, and more importantly, evidence of Hamilton's intoxication, particularly the level of intoxication, illuminated the interaction between Stanton and the victim. It is axiomatic that an encounter with a sober person is qualitatively different than an encounter with an intoxicated one. Impaired judgment, aggression, and loss of inhibition are all familiar symptoms of alcohol intoxication.

The majority's adoption and extension of our court of appeals' decision in *Cagle v.*

*State*, 68 Ark. App. 248, 6 S.W.3d 801 (1999), is not warranted by the case before us. First, cocaine does not have the same effect on a person as alcohol. Second, unlike the defendant in *Cagle*, Stanton knew that Hamilton had been consuming alcohol. Furthermore, the law recognizes that a layperson is able to opine about another person's alcohol intoxication. *David v. State*, 286 Ark. 205, 691 S.W.2d 133 (1985). Clearly, it was relevant. Stanton's perceptions of Hamilton's demeanor unquestionably shaped his reactions to him. As such, it would be an integral part of Stanton's justification defense.

III. *Limitation on Stanton's Cross-Examination of Lavon Strong*

I choose not to unravel the State's objection to questioning Strong about whether his testimony was influenced by a "deal" concerning pending charges in the State of Texas. It is apparent from the record that the State wished to avoid having to explain why a deputy prosecutor in Arkansas, Kristian Robertson, was representing Strong in Texas under a different name, Kristian Young. However, there was clear error in limiting cross-examination concerning the large knife in the backpack.

Stanton has a constitutional right to impeach a witness on cross-examination. *Rogers v. State*, 2018 Ark. 309, 558 S.W.3d 833. A prior inconsistent statement is a prime means of impeaching a witness's credibility. Ark. R. Evid. 613. In his previous trial, Stanton had been represented by other trial counsel who had interviewed Strong while he was in jail in Texas on the previously noted, unrelated charges. They had recorded Strong's statement. In the recorded statement, Strong admitted to them that he had seen a big blade on San Marcus Jacobs. However, at trial, Strong denied seeing such a weapon. Nonetheless, when the police

17

arrived, Jacobs's possessions included a bag with a large knife. There was a fact question of whether Jacobs had it at the time of the shooting and had put it in the bag or whether it had been there all along. Stanton's position was that this knife was probably the item that he thought was an outline of a gun. The fact that Strong has previously denied seeing the knife clearly went to his credibility. Stanton argued that this denial of impeachment violated his right of confrontation by restricting his ability to show that Strong had lied under oath.

The issue is not whether the large knife *was a bayonet* or merely *looked like a bayonet*. The issue was whether Strong was lying when he stated that he saw a large knife or whether he was lying when he denied it. The circuit court abused its discretion in limiting Stanton's right to confront Strong by full and fair cross-examination.

IV. *Error under Arkansas Supreme Court Rule 4-3(i)*

In my examination of the record, I have found additional preserved errors that would warrant reversal of this case. During the sentencing phase of the trial, the State presented the testimony of Shana Craig who claimed that, without provocation, Stanton hit her in the face. The State subsequently presented testimony from Mack Hamilton that Stanton had pulled a gun on him. Notably, this testimony was substantially the same as that presented by the State during the guilt phase of Stanton's first trial, and it resulted in his conviction being overturned. *Stanton v. State*, 2017 Ark. 155, 517 S.W.3d 412. Inexplicably, despite being chastened by having the case reversed, the State adduced this testimony again. This testimony is improper. *Id.* I am mindful that in the first trial the State introduced the testimony in the guilt phase, and in the case before us, the testimony was elicited in the penalty phase.

18

However, that is of no moment; it is reversible error to present evidence of uncharged crimes in the sentencing phase of a trial. *Walls v. State*, 336 Ark. 490, 986 S.W.2d 397 (1999).

I concur in part and dissent in part.

*Jeff Rosenzweig*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.